UNITED STATES of America, Plaintiff,

v.

CROCKER NATIONAL CORP., et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

BANKAMERICA CORPORATION, et al., Defendants.

Nos. C–75–2108 RFP, C–75–2109 RFP.

United States District Court, N. D. California.

Aug. 27, 1976.

Anthony E. Desmond, San Francisco, Cal., Crossan R. Andersen and Polly L. Frenkel, Dept. of Justice, Antitrust Div., Los Angeles, Cal., for plaintiff United States in Nos. C–75–2108 RFP and C–75–2109 RFP.

Robert D. Raven, Melvin R. Goldman and William Alsup, Morrison & Forester, San

Francisco, Cal., for Crocker Nat. Bank and Thomas R. Wilcox.

Ira M. Millstein, Irving Scher and Salem M. Katsh, Weil, Gotshal & Manges, New York City, for Metropolitan Life Ins. Co.

J. Randolph Wilson, Virginia G. Watkin, Covington & Burling, Washington, D. C., for The Equitable Life Assur. Soc. of the United States and The Mut. Life Assur. Co. of New York.

Richard E. Guggenhime, Sr., Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for Emmett G. Soloman.

H. Helmut Loring, Theodore Sachsman and William S. MacKay, San Francisco, Cal., for Bank of America Nat. Trust and Sav. Ass'n and BankAmerica Corp.

Edward Wolfe, White & Case, New York City, for Bankers Trust New York Corp. and Bankers Trust Co.

William Simon, John S. Kingdon and Robert J. Brookhiser, Jr., Howrey & Simon, Washington, D. C., for The Prudential Ins. Co. of America and Paul A. Gorman.

Robert D. Raven, Morrison & Foerster, San Francisco, Cal., for E. Hornsby Wasson.

## GENERAL BACKGROUND

PECKHAM, District Judge.

These cases concern the legality of certain interlocking directorates under section 8 of the Clayton Act, 15 U.S.C. § 19. The government's attack is aimed at two particular types of director interlocks which may be identified as follows: (1) *the bank interlocks*, occurring whenever an individual serves simultaneously as the director of a bank and an insurance company; and (2) *the bank holding interlocks*, occurring whenever an individual serves simultaneously as a director of a bank holding company and an insurance company.

Specifically, in the context of these cases, the "bank interlocks" that the government

challenges in the *Crocker* case (C–75–2108 RFP) arise from the fact that certain individual defendants, Otto N. Miller ("Miller"), Emmett G. Soloman ("Soloman") and Thomas R. Wilcox ("Wilcox") serve simultaneously as directors of defendant Crocker National Bank ("Crocker Bank") and as directors of one of the following insurance company defendants: the Metropolitan Life Insurance Company ("Metropolitan"), The Equitable Life Assurance Society of the United States ("Equitable"), and the Mutual Life Insurance Company of New York ("MONY"). The "bank holding interlocks" challenged in this case arise from the fact that those individual defendants also serve simultaneously as directors for Crocker Bank's parent corporation, Crocker National Corporation ("Crocker") and as directors for one of the aforesaid mentioned insurance companies.

In the *BankAmerica* case (C–75–2109 RFP), the "bank interlocks" that are challenged arise from the fact that certain individual defendants, E. Hornsby Wasson ("Wasson") and Paul A. Gorman ("Gorman") serve simultaneously as directors of either Bank of America National Trust & Savings Association ("Bank of America") or Bankers Trust Company ("Bankers Trust") and the Prudential Insurance Company of America ("Prudential"). The "bank holding interlocks" challenged there arise from the fact that the same individual defendants also serve simultaneously as directors for one of the aforesaid mentioned banks' parent corporations, Bank America Corporation ("BankAmerica") and the Bankers Trust New York Corporation ("Bankers"), and Prudential.

The parties' cross-motions for summary judgment are presently before the court.[1] They raise four questions, which, with one exception, revolve around the interpretation and application of the following portion of section 8 of the Clayton Act:

---

1. Individual defendants Miller and Wasson, who have previously entered into settlement agreements with the Government, are the only parties not to bring summary judgment motions. It should also be noted that the Govern-

ment's motion in the *BankAmerica* case is more properly denominated a motion for partial summary judgment due to the pending motion of BankAmerica and Bank of America that the case is moot with respect to them.

No person at the same time shall be a director in any two or more corporations, any one of which has capital, surplus, and undivided profits aggregating more than $1,000,000, engaged in whole or in part in commerce, other than banks, banking associations, trust companies, and common carriers subject to the Act to regulate commerce . . . if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws. [15 U.S.C. § 19 (emphasis added).]

The four questions presented are as follows:

(1) Whether, in light of the "other than banks" language underscored above, the challenged "bank interlocks" are proscribed by section 8?

(2) Whether the "bank holding interlocks" are outside the scope of section 8 because the bank holding companies are not "competitors" of the insurance company defendants?

(3) Whether the above-quoted provision of section 8 applies to the corporate defendants or only to the individual director defendants?

(4) Whether, since both types of interlocks challenged by the government involve insurance companies, they are immunized from section 8 of the Clayton Act by virtue of the antitrust exemption provided in the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015?

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

In order to facilitate the court's ruling on the questions posed by these summary judgment motions, the parties have agreed to a series of stipulations including an agreed statement of facts. Basically, these stipulations concede the existence of each of the challenged interlocks,[2] establish that each of the corporate defendants are engaged in interstate commerce and have capital surplus or aggregated undivided profits in excess of $1,000,000,[3] and admit that the bank defendants and insurance company defendants are competitors in certain mortgage and real estate loans such that an agreement between them to eliminate competition would be an antitrust violation.[4] The stipulations also establish that each bank defendant is the wholly-owned subsidiary of its parent company and that each parent company is a bank holding company registered under the Bank Holding Company Act, as amended 12 U.S.C. § 1841 et seq.[5] It is further established that the bank holding company defendants are not in and of themselves or through subsidiaries, other than the bank defendants, competitors of any of the insurance company defendants; however, each bank holding company defendant admits that it controls its subsidiary bank by and through its ownership of stock and its election of all the subsidiary's directors who in turn manage the bank and select the officers that control the bank's operations and activities.[6]

## DISCUSSION

### I. ARE DIRECTOR INTERLOCKS BETWEEN A BANK AND AN INSURANCE COMPANY PROHIBITED BY SECTION 8 OF THE CLAYTON ACT?

#### A. Introduction

In attacking the "bank interlocks" that exist among the defendants, the Government relies solely upon the fourth paragraph of section 8 of the Clayton Act, set forth in relevant part below:

2. See Crocker Stip. ¶¶ 15–19; BA Stip. ¶¶ 17–20.

3. Crocker Stip. ¶¶ 6, 7, 8, 11, 12, 13, 14; BA Stip. ¶¶ 6, 7, 8, 11, 12, 15, 16.

4. Crocker Stip. ¶ 3(c)(1) 21–29; BA Stip. ¶¶ 3(c)(1) 22–29.

5. Crocker Stip. ¶¶ 8, 11; BA Stip. ¶¶ 8, 11, 12, 15.

6. Crocker Stip. ¶¶ 3(c), 3(d), 9; BA Stip. ¶¶ 3(c), 3(d) 9, 13.

No person at the same time shall be a director in any two or more corporations, any one of which has capital, surplus, and undivided profits aggregating more than $1,000,000, engaged in whole or in part in commerce, other than banks, banking associations, trust companies, and common carriers subject to the Act to regulate commerce . . . if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws.

An examination of this language reveals four criteria which must be met before this statute may be applied: First, a person must simultaneously serve as a director of two or more competing corporations; second, at least one of the corporations must have capital, surplus, and undivided profits of an amount greater than $1,000,000; third, both or all of the corporations must be engaged in interstate commerce; fourth, the corporations must be other than banks, banking associations, trust companies and common carriers.

Upon the record before us, it is clear that the first three of these criteria are satisfied. *See* notes 2–4, *supra*, and accompanying text. The only question presented here is whether the fourth criteria—that the corporations be other than banks, banking associations, trust companies, and common carriers—has been met.

Defendants argue that none of the challenged bank interlocks involve two or more corporations *other than banks*. Rather, they note that each of the challenged bank interlocks involve two corporations, one of which *is* a bank. Accordingly, defendants argue that the clear statutory criterion of section 8 has not been satisfied, and, therefore, that the challenged bank interlocks are immune from prosecution under section 8. *See* Memorandum of Law in Support of Joint Motion for Summary Judgment of Defendants, p. 8 (hereafter "Defendants' Opening Brief").

■ The Government takes the position that the language "no person shall be a director in any two or more corporations other than banks" requires that *both* corporations, not just one, be banks in order to be exempt from section 8. Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (hereafter "Gov't Opening Brief") p. 14. It contends that interlocking directorates between banks were specifically regulated in the first three paragraphs of section 8 and that the "other than banks" language of the fourth paragraph of section 8 could only have been intended to mean other than two banks which were regulated elsewhere in the statute. *See* Transcript of Oral Argument, June 25, 1976 (hereafter "Transcript"), p. 13. Any other interpretation, argues the Government, would leave a gaping loophole in the regulation of interlocking directorates which Congress did not and could not have intended. In this regard, the Government relies heavily on the teaching of *United States v. Philadelphia Nat'l Bank*, 74 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) that exemptions to the antitrust laws are not to be lightly implied. *Id.* at 343, 83 S.Ct. 1715.

■ Notwithstanding the Government's vigorous argument on this question, we do not find their position to be convincing. As is set forth below in greater detail, it is the opinion of this court that a normal reading of the statutory language "two . . . corporations . . . other than banks" compels the conclusion that the statute applies only to two corporations, neither of which is a bank. Moreover, this conclusion is further buttressed by 60 years of administrative and Congressional interpretations to this effect, as well as by the statute's legislative history. Finally, it is readily apparent that the interpretation advanced by the Government is not consistent with the statutory structure by which Congress chose specifically to regulate interlocking directorates among banks and among common carriers, and is unsupported by section 8's legislative history.

### B. The Statutory Language

It is the opinion of this court that an ordinary reading of the statutory prohibition "[n]o person . . . shall [serve as] a director in any two or more corporations . . . other than banks" means that banks were not to be subject to this prohibition. This interpretation is compelled by the Government's own analysis. Gov't Opening Brief, pp. 16–17. As the Government clearly sets forth in its brief, the fourth paragraph of section 8 features four clauses, each of which modifies the phrase "any two or more corporations":

No person at the same time shall be a director in *any two or more corporations*

(1)

any one of which has capital, surplus, and undivided profits aggregating more than $1,000,000,

(2)

engaged in whole or in part in commerce,

(3)

other than banks, banking associations, trust companies, and common carriers subject to the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven,

(4)

if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws. [15 U.S.C. § 19 (emphasis added).]

With reference to this analysis, all parties agree,[7] and it is readily apparent to the court, that all of the four limiting clauses apply to both corporations involved in an interlock, except for the first clause which by its own specific terms may be satisfied by "any one of" the two interlocked corporations. Hence, it is clear then that both interlocked corporations must satisfy clause 2—that is, they must both be engaged in whole or in part in commerce; that both corporations must satisfy clause 4—that is, they must be competitors; and finally and most significantly, that both corporations must satisfy clause 3—that is, they must both be other than banks, banking associations, trust companies and common carriers. *See also* 16B Von Kalinowski, *Antitrust Laws and Trade Regulation*, § 20.03 at pp. 20–29 (1975) (hereafter "Von Kalinowski").

In light of this clear statutory language, further inquiry here would not appear necessary. *See Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, 681 (1976). Nevertheless, in order to eradicate any lingering doubt that might persist about the validity of the Government's contentions, we will explore the other lines of argument advanced by the parties. We turn first to the continuous contemporaneous construction which has been given to this statute for more than 60 years.

### C. Administrative and Congressional Interpretations of Section 8.

More than 60 years of administrative interpretation and Congressional action confirm this court's interpretation of section 8.

In its 1950 Report on Interlocking Directorates, the Federal Trade Commission, which has concurrent jurisdiction with the Department of Justice in the enforcement of section 8, described the scope of that section as follows:

The Clayton Act's two sections dealing with interlocking directorates embody three different rules of law applicable to different classes of corporations. One rule [, set forth in the fourth paragraph of section 8] governs corporations engaged in commerce *which are neither* banks, banking associations, trust companies nor common carriers. . . .

---

**7.** In originally offering this analysis, the Government mistakenly assumed that the defendants contended that the "other than bank" language was somehow related to, or intended to modify, the "any one of which" phrase which appears in clause 1. *See* Gov't Opening Brief, pp. 16–17. As defendants make clear in their own brief, this was never their position. Reply Memorandum of All Defendants Except E. Hornsby Wasson on Their Joint Motion for Summary Judgment (hereafter "Defendants' Reply Brief") p. 5.

[This] first rule [is] applicable generally to industrial and commercial corporations ...... [T]he type of relationship that is prohibited is narrowly defined. *The rule does not apply to interlocking directorates between . . . industrial and commercial corporations and financial institutions.* [Report of the Federal Trade Commission on Interlocking Directors, H.R. Doc. No. 652, 81st Cong., 2d Sess. 10 (1950) (emphasis added).]

*See also* Testimony of Lewis Engman, *Hearings on Corporate Disclosure Before the Subcommittee on Budgeting Management, and Expenditures and the Subcommittee on Inter-Governmental Relations, Senate Committee on Government Operations,* 93d Cong., 2d Sess., pt. 2 at 900–901 (1974).

The history of administrative interpretation of section 8 within the Antitrust Division has been to the same effect. Thus, notwithstanding the fact that approximately 40% of the insurance company directors in America are also bank directors,[8] these instant cases represent the first time, since section 8 was enacted over 60 years ago, that the Justice Department has attacked a bank/nonbank interlock of the type now being challenged. In fact, shortly before the Justice Department filed these cases, Assistant Attorney General for Antitrust, Thomas Kauper, expressed concern about the interlocks that existed between financial institutions and insurance companies, but acknowledged that section 8 of the Clayton Act "may not be directly applicable." *See American Metal Market,* Vol. 81, No. 137, July 16, 1974.

Similarly, several Congressional bodies with antitrust and banking authority have studied section 8 and have concluded that it has no application to bank/nonbank interlocks. A Staff Report to the Antitrust Subcommittee of the Committee on the Judiciary of the House of Representatives, entitled "Interlocks in Corporate Management"[9] observed that there is:

no prohibition in the statute against . . . either vertical or horizontal, direct or indirect, interlocks between the banking organizations and other types of corporations. (Id. at 25).

Likewise a Staff Report of the House Committee on Banking and Currency, noted as follows:

One of the major provisions supported by Wilson and others for inclusion in the Clayton Act was the prohibition of interlocking directorates between major banking institutions on the one hand, and major industrial, commercial and transportation corporations on the other. Despite this support and the demonstrated need for such provisions shown in [Congressional investigative reports], these prohibitions against vertical corporate interlocks were never adopted. *Therefore, the banks remained and still remain free to have representatives on the boards of any non-banking corporation.* [Staff of the Subcomm. on Domestic Finance of the House Comm. on Banking and Currency, 90th Cong., 2d Sess., *Report on Commercial Banks and their Trust Activities: Emerging Influence on the American Economy* at 11. (Subcomm.Print 1968.) (Emphasis added.) *See also id.* at 926.]

Indeed there have been several Congressional attempts to enact new legislation that would reach the "bank interlocks" challenged here. The first attempt at enacting this type of legislation occurred in 1933 and was in fact successful. It provided that the Clayton Act be amended by the addition of a new section 8a, which prohibited interlocks between banks and other corporations that made "loans secured by stock or bond collateral to any individual, association, partnership, or corporation other than its own subsidiaries." Act of June 16, 1933, P.L. No. 66, ch. 89, § 33, 48 Stat. 194. This section, however, was repealed on August 23, 1935[10] with the specific intention of eliminating the prohibition against interlocking directorates among

---

8. Transcript p. 27.

9. 89th Cong., 1st Sess. (Comm.Print 1965).

10. P.L. No. 305, ch. 614, § 329, 49 Stat. 717.

banks and institutions with which they competed in making loans. *See H.R.Rep. No.742, 74th Cong., 1st Sess. 24 (1935).*

Moreover, there have been several more recent, though unsuccessful, attempts to amend section 8. H.R. 11572, introduced by Representative Celler on October 13, 1965, would have prohibited director, officer, or management-employee interlocks, as well as interlocks effectuated through potential nominees of these persons, between *inter alia* (a) actual or potential competitors or (b) actual or potential customers, suppliers, or sources of credit or capital. The bill was referred to the Committee on the Judiciary, where it died in Committee without hearings. Representative Celler thereafter introduced the same bill (H.R. 2509) on January 17, 1967, in the first session of the 90th Congress. That bill was also referred to the Judiciary Committee where it died without hearings. *See also* H.R. 2346, 91st Cong., 1st Sess. (Celler) (1969); H.R. 3245, 92nd Cong., 1st Sess. (Celler) (1971); H.R. 13581, 93d Cong., 2d Sess. (1974); H.R. 14997, 93d Cong., 2d Sess. (1974); H.R. 4406, 94th Cong., 1st Sess. (1975). All these would have made the same change; and all died in committee. Similarly, in 1971, the House Committee on Banking and Currency held hearings on H.R. 5700. Sections 2, 3 and 4 of that bill would have prohibited *inter alia* interlocks between insurance companies and any bank insured by the F.D.I.C., any insured institution as defined in the National Housing Act, and noninsured mutual savings banks. Congress also allowed H.R. 5700 to die in committee.

Thus, these administrative and Congressional interpretations of section 8 further support this court's construction of that section's fourth paragraph. The Government, though, argues that these interpretations are of no help in interpreting section 8 and relies on *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 348–49, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) where the existence of administrative interpretations and Congressional action, similar to those described here, did not foreclose the court from reaching a result contrary to the thrust of those interpretations. In our opinion, however, *Philadelphia Bank* does not hold, as the Government contends, that such administrative and Congressional interpretations are totally irrelevant or devoid of all reliability. Rather, the case simply notes that the views of a subsequent Congress may often provide a hazardous basis from which to infer the intent of an earlier one. *Id.* We are aware of the pitfalls which that type of analysis entails. Nevertheless, in view of the clear and consistent manner in which Congress, the FTC, and the Department of Justice have *all* interpreted section 8 of the Clayton Act, we feel that such interpretations deserve mention. Certainly, at the very least, they are relevant to refute the Government's contention that section 8 "*unambiguously*" applies to "any two (or more) competing corporations engaged in commerce unless *both* such corporations are banks, banking associations, trust companies or common carriers." Gov't Opening Brief, p. 14.

However, even ignoring the administrative and Congressional interpretations just described, it is readily apparent that the Government's interpretation of section 8 cannot be sustained when examined in the light of the statutory structure and the legislative history of the Clayton Act.

### D. *The Statutory Structure of the Clayton Act*

Both section 8 and section 10 of the Clayton Act 15 U.S.C. §§ 19, 20, are concerned with the subject of interlocking directorates. The fourth paragraph of section 8, at issue here, governs interlocks between competing corporations in commerce *other than banks and common carriers.* Interlocking directorates for these excepted classes of corporations are governed in the first three paragraphs of section 8 and in section 10, respectively.[11]

The first paragraph of section 8 prohibits a variety of horizontal interlocking relationships between certain Federal Reserve

---

**11.** The full text of both these sections is set forth in the Appendix to this opinion.

Member banks and other banks, banking associations, savings banks and trust companies. However, not all horizontal bank interlocks are prohibited. The first paragraph of section 8 contains seven specific exceptions to which the statute's prohibition is inapplicable. 15 U.S.C. § 19(1)–(7). The second and third paragraphs of section 8 also relate to interlocks between banks. The second paragraph of section 8 concerns certain transitional provisions that are no longer relevant. The third paragraph of section 8 authorizes the Board of Governors of the Federal Reserve System to enforce compliance with the provisions governing bank interlocks and to prescribe such rules and regulations as it deems necessary for that purpose.

Section 10 of the Clayton Act governs interlocking directorates among common carriers engaged in commerce. In contrast to the specific prohibitions set forth in section 8, section 10 provides only a limited type of regulation that is applicable to interlocks between a common carrier and a second company [12] that has certain supplier or buyer relationships with that common carrier. Significantly, section 10 does not prohibit or regulate horizontal interlocks among competing common carriers. Indeed, these interlocks were not regulated at all until 1920 when Congress amended the Interstate Commerce Act and authorized the Interstate Commerce Commission to assume this task. See 49 U.S.C. § 20a(12).

Given this statutory structure, the Government takes the position that the fourth paragraph of section 8 should be interpreted as follows:

> No person . . . shall be a director in any two or more corporations . . . other than [two] banks; [that is other than banks as previously regulated in the Act].

Transcript, p. 13.[13] In other words, the Government argues that the "other than banks" language of paragraph 4 means

"[w]here Congress has previously regulated two bank interlocks they are not to be also proscribed under the fourth paragraph." *Id.*

In analyzing this argument, it is necessary to clarify what the Government means by the phrase "previously regulated." Initially, it appeared that the Government was using this phrase as meaning "previously prohibited." *See e. g.,* Gov't Opening Brief, p. 4. However, the use of the phrase in this manner poses serious problems. An analysis of the first three paragraphs of section 8 and of section 10 reveals that Congress did not prohibit all bank/bank interlocks in section 8 and did not prohibit horizontal carrier/carrier interlocks in section 10. Thus, were the Government to rely on a "prohibited elsewhere" interpretation, it would mean that certain bank/bank or carrier/carrier interlocks would be subject to the proscription of the fourth paragraph of section 8 despite the Government's assertion that that part of section 8 unambiguously "applies to any two (or more) competing corporations engaged in commerce unless *both* such corporations are banks, banking associations, trust companies, or common carriers." Gov't Opening Brief, p. 14.

Hence, it would appear that the Government's "previously regulated" theory encompasses a broader range of interlocks than those interlocks actually prohibited elsewhere in the statute. Rather, if the general subject was regulated elsewhere, as bank/bank interlocks were regulated in the first three paragraphs of section 8, the Government's position seems to be that the later language of exclusion found in paragraph 4—the "other than banks" language—intended only to exclude those specific interlocks, and not bank/nonbank interlocks which the first three paragraphs of section 8 did not purport to regulate. The problem, however, with this theory is that when it is applied to the "other than . . . common carrier" language, which also ap-

---

12. This second company may, but does not have to be, a common carrier.

13. The use of brackets here serves to indicate how the Government's interpretation of this provision adds words to those used in the statute.

pears in the fourth paragraph of section 8, an inconsistent result is reached.

As was previously indicated, Congress chose to regulate many carrier/noncarrier interlocks in section 10. Thus, applying the Government's "previously regulated" interpretation, it would follow that carrier/noncarrier interlocks would not be subject to paragraph 4's prohibition. Yet, such a conclusion would also conflict with the Government's theory that paragraph four of section 8 was intended to apply to any two or more competing corporations engaged in commerce unless *both* such corporations were banks and common carriers, as well as with that theory's corollary that bank and nonbank interlocks, and hence, presumably carrier and noncarrier interlocks, would be subject to that section's prohibition. Hence, in order for the Government's "previously regulated" theory to produce the result that it desires, the plain language of section 8, prohibiting persons from serving as directors in any "two or more [competing] corporations . . . other than banks . . . and common carriers," would have to be interpreted as providing:

> No person . . . shall be a director in any two or more [competing] corporations . . . except that if *two* or more of the corporations are banks, . . or if *one* or more of the corporations is a common carrier, the prohibition of this section will not be applicable as those interlocks are regulated elsewhere in the statute.

Such an interpretation would certainly strain the language that Congress chose to place in section 8.[14]

We note, however, that the Government's "previously regulated" theory is not completely off base. It is only the Government's view of what it means to say that a subject has been "previously regulated"

which appears to be wrong. The legislative history underlying section 8 of the Clayton Act in fact suggests that Congress, having regulated banks in the first three paragraphs of section 8 and having regulated common carriers in section 10, wished to make clear that these classes of corporations were not to be regulated at all in paragraph 4 of section 8. Indeed this is the only interpretation that provides a consistent explanation of the "other than banks and common carrier" language that Congress utilized in section 8. In addition, as the following description of section 8's legislative history reveals, there is nothing to suggest bank/nonbank interlocks were to be subject to the prohibition of the fourth paragraph of section 8.

### E. *The Legislative History of Section 8*

The Clayton Act's provisions regulating interlocking directorates grew out of the reports of two Congressional investigations of interlocking directorates. *See* U.S. House of Representatives Committee on Banking and Currency, *Investigation of Concentration of Control of Money and Credit*, H.R.Rep.No.1593, 62nd Cong., 3d Sess. (1913) (popularly and hereafter known as "Report of the Pujo Committee"); *Investigation of United States Steel Corp.*, H.R. Rep.No.1127, 62nd Cong., 2d Sess. (1912) (popularly and hereafter known as the "Report of the Stanley Committee"). These Congressional investigations in turn prompted Louis Brandeis to write a series of weekly magazine articles in which he vigorously attacked and revealed the extent of common corporate management among large business organizations, including banks and insurance companies. *See* Brandeis, *"Breaking the Money Trusts,"* Harpers Weekly, Nov. 22, 1913 to January 17, 1914. *See particularly, "The Endless Chain—Interlocking Directorates,"* Harpers Weekly

---

**14.** Alternatively, if we focus upon the fact that the fourth paragraph of section 8 was concerned with interlocks among *competing* corporations, we again note that Congress did not choose to regulate any competing carrier/carrier interlocks in section 10. Hence according to the Government's "previously regulated" theory, Congress would have desired to regulate these interlocks pursuant to paragraph 4, section 8. However, even according to the Government's contention that the "other than banks . . . and common carriers" language of exclusion should be read as "other than [two] banks . . . and common carriers," this result would still be precluded.

for December 6, 1913. Finally, President Wilson himself demanded legislation to prohibit interlocking directorates among the "great corporations—banks and railroads, industrial, commercial and public service bodies." *See* H.R.Rep.No.627, 63d Cong., 2d Sess. 17–18 (1914). As a result of all these efforts, the initial Clayton Bill was introduced in the House and hearings were held; however, despite these beginnings, Congress never prohibited the "bank interlocks" that the Government attacks here.

1. *The initial Clayton Bill and trust hearings.* The initial Clayton Bill contained three sections which prohibited horizontal interlocking directorates with regard to three distinct classes of business organizations—railroads and certain other public service corporations, banks, and other competing corporations.[15] At the hearings held on this bill, Mr. Brandeis testified that "both banks and insurance companies . . . ought to be included in that prohibition" of the bill relating to banks. *Hearings on Trust Legislation Before the House Comm. on the Judiciary*, 63d Cong., 2d Sess., 681 (1914) (hereafter "Trust Hearings"). Mr. Untermeyer, counsel for the Pujo Committee, joined in Brandeis's assessment of the impact of the proposed bill. He remarked:

> I think there is a grave question as to whether a director in a great life insurance company should be a director in a bank. You have failed to cover that feature. [*Id.* at 823.]

Thus, as far as the initial Clayton Bill went, it is significant that despite the recommendations of the Pujo Committee and Brandeis, no explicit prohibition of interlocking directorates between banks and insurance companies was included.

2. *The subsequent House bill.* At the conclusion of the Trust Hearings, the bill that was to become the Clayton Act, H.R. 15657, as introduced by Congressman Clayton, was referred to the House Judiciary Committee. Section 8 of this bill dealt with director interlocks and contained substantive prohibitions which were generally parallel to the prohibitions contained in the original Clayton Bill. The first paragraph prohibited interlocking relationships between common carriers and other companies with which carriers might do business. Paragraphs two and three prohibited horizontal interlocks among banks, banking associations and trust companies that had deposits capital, surplus and undivided profits of more than $2,500,000 or which were located in the same town if that town had more than 100,000 inhabitants. The fourth paragraph of this bill provided:

> . . . no person at the same time shall be a director in any two or more [competing] corporations engaged in whole or in part in commerce, other than common carriers . . . .[16]

This was the first instance in which the crucial language of exclusion, "other than," appeared in the fourth paragraph of section 8. Significantly, throughout the subsequent debates and legislative reports, no doubt was ever expressed that the effect of this clause was other than to exclude common carriers from this part of section 8.[17]

3. *The House Report and initial House debates.* The House Report[18] accompany-

---

15. More specifically, section 1 of the bill prohibited officer and director interlocks between railroads or other public service corporations and certain other companies that were in the business of selling or manufacturing certain types of railroad equipment, or mining coal, or conducting the business of banks or trust companies. Section 2 forbade interlocks between banking organizations. Section 3 provided criminal penalties for violations of the first two sections. Section 4 established a conclusive presumption of a violation of the Sherman Act from the existence of an interlocking directorate among competing corporations in commerce. The full text of this bill is set out in Appendix A to Defendants' Opening Brief.

16. The full text of H.R. 15657 is set out in Appendix B to Defendants' Opening Brief.

17. See e. g., Remarks of Representative Sherley and Representative Mann excerpted from 51 Cong.Rec. 16271–16273 and set forth in relevant part at pp. 697–699 *infra*.

18. H.R. 15657 was eventually reported to the House with certain minor changes: the interlocking directorate section was renumbered section 9; the banking provisions were modified by the addition of three exceptions; and, a $1,000,000 size requirement was added to the provision in the fourth paragraph.

ing H.R. 15657 highlighted the precise division of section 8's (then section 9's) individual paragraphs and referred to the provision here in question as affecting "industrial corporations" as distinct from "banks":

This section is divided into three paragraphs, each of which relates to the particular class of corporations described, and *the provisions of each paragraph are limited in their application to the corporations belonging to the class named therein.*

The first paragraph deals with the eligibility of directors in interstate railroad corporations . . . . The second paragraph of the bill deals with the eligibility of directors, officers, and employees of banks, banking associations and trust companies.

The third paragraph of section 9 deals with the eligibility of directors in *industrial corporations* engaged in commerce . . . . In this, as in the preceding paragraph relating to *banks*, it was not deemed advisable or necessary that interlocking directorates should be prohibited between the smaller *industrial corporations.* [H.R.Rep.No.627, 63d Cong., 2d Sess. 18–19 (1914) (emphasis added).]

The House Debate following the introduction of H.R. 15657 further crystallized the statutory distinction between the classes of business organizations which were to be subject to regulation under what is now section 8. In discussing the size requirements of the provisions regulating interlocking directorates among banks, two Congressmen engaged in the following colloquy:

Mr. Graham of Pa.: The gentleman does not mean that the two million and a half exemption has any application to industrial corporations?

Mr. Carlin. Oh, no; we apply an entirely different rule to industrial corporations. [51 Cong.Rec. 4272 (1914).]

In later debate on this section at a time when it did not include the exclusionary phrase "other than banks, banking associations, trust companies," a question was raised as to whether "the industrial corporations" paragraph would have any application to banks:

Mr. Cullop. That [paragraph] refers to some other corporation than a bank. That does not apply to a bank. If the gentleman from Massachusetts [Mr. Phelan] and the gentleman from Arkansas [Mr. Floyd] will observe, commencing on line 24 of page 29, the language is:

That from and after two years from the date of the approval of this act no person at the same time shall be a director in any two or more corporations, either of which has capital, surplus, and undivided profits aggregating more than $1,000,000, engaged in whole or in part with commerce.

*This has no reference to the banking business, but to other affairs.*

Mr. Carlin. That related to industrial commerce.

Mr. Cullop. Yes, that does not relate to banking. That relates to industrial and commercial corporations, or institutions of that kind, but has no reference whatever to the banking business. *Id.* at 9604. (Emphasis added.)

4. *The Senate proceedings.* H.R. 15657 underwent significant change upon being sent to the Senate. The Senate Committee on the Judiciary substantially revised the common carrier provisions of the House bill. Moreover, it completely eliminated the entire banking provision in 15657, stating that the regulation of interlocking directorates involving banks should be accomplished by amendment of the banking laws. *See* S.Rep.No.698, 63d Cong., 2d Sess. 48 (1914). Significantly, however, the Senate Committee deliberately left the House provision "relating to interlocking directorates of industrial corporations" completely intact. *Id.* at 14–16. Thus, it seems clear that the Senate also thought that the "industrial corporation" paragraph did not apply to banks.

The Senate version of the bill passed the Senate on September 7, 1914. The House

refused to accept the Senate's amendments and the bill went to the Conference Committee. At this juncture neither the House nor Senate versions of what is now section 8 of the Clayton Act contained the "other than banks" language here in issue.

5. *The Conference Committee.* The Conference Committee restored, with certain changes,[19] the House's banking provisions, placed the common carrier prohibition in a separate section (section 10), and added "banks, banking associations, and trust companies" to the "other than" clause contained in the fourth paragraph of section 8. Nothing in the Conference Report explains the reasons for these changes. These changes were, however, the subject of considerable House debate.

6. *Further House debate.* On October 7, 1914, the Conference Report was read to the House along with a statement of the changes that were made. Immediately after the reading of these documents, Representative Mann raised a "point of order" against the Conference Report arguing that the expansion of the "other than" clause to include "banks, banking associations, trust companies" was tantamount to a material change in the proposed legislation, and thus in excess of the conferees' authority. He stated:

> The House . . . passed section 7 prohibiting interlocking directorates of all corporations having a capital of over a million dollars . . . if it affected competition or they were competitors, and the Senate agreed to identically the same language. . . . *What the conferees have done is to eliminate from this section all banking corporations.* [51 Cong.Rec. 16269.]

> I know of nothing more vital which was before the House than the power and right to prevent interlocking directorates of banks. Here was one of the issues that has been more discussed than any

other by the great committee of the House which sat for weeks and months— that so-called Untemeyer committee or the Pujo committee. That was one of the basic things that the committee made findings on and when this bill was prepared it provided a prohibition against interlocking directorates of banks. The House passed it in that shape. The Senate passed it in that shape. But the House Conferees, without authority and over and beyond any jurisdiction granted to them, have provided that banks shall no longer be controlled by the prohibition of interlocking directorates where banks are in competition.

> So I say, that the conference report should be rejected as subject to a point of order. [51 Cong.Rec. 16270.]

Two other Congressmen, Mr. Webb of North Carolina, one of the members of the Conference Committee, and Mr. Sherley of Kentucky, responded to Representative Mann's argument. Mr. Webb stated:

> The conference . . . put in "banks and banking associations" in order to make perfectly clear what in my opinion is already clear; because of the preceding paragraph we had passed in a section with reference to interlocking directorates of banks, and there we made the limitation $5,000,000. Now it would be idiotic to say that we included also banks and banking associations in the paragraph referring to industrial corporations; and in order to make the paragraph perfectly plain, we inserted "other than banks, banks associations" and common carriers, which had no effect upon the meaning of that section. . . . [51 Cong.Rec. 16271.]

The remarks of Congressman Sherley are also relevant here:

> Now what confronted the conferees? The House had provided that the provisions touching interlocking directorates

---

19. One significant change is that the size limitation of section 8's prohibition against interlocking directorates among banks was raised from $2,500,000 to $5,000,000. In addition, it appears that the Conference Committee also renumbered what was section 9 of H.R. 15657, and what the Senate had numbered as section 7, to section 8, which it has remained to this day.

should apply to three classes—common carriers, banks and industrial corporations. The Senate had seen fit to eliminate the banks. That left in issue the material point of whether banking corporations should be brought within the provisions of the law prohibiting interlocking directorates. The House insisted on its provision, and was successful in its insistence with one or two minor changes. The House had limited the provision as to banks by making it apply to banks with a capital stock of two and a half million dollars.

The conferees agreed that it should apply to banks with capital and surplus of $5,000,000. *In other words, The House conceded something by making the group smaller and requiring the banks to have large capital and surplus, and the Senate conceded something by including banks in it at all.* That was a perfectly proper subject for consideration and determination, but evidently in reading the language of the act as it had been originally passed by the House, and as it had been incorporated in part by the Senate in section 7, the question was raised as to whether it was not possible that section 7 might be held to apply to banks.

Now, it is perfectly clear to my mind that no court would have so held, because having expressly dealt with banks with a capital stock of two and a half million dollars, when you come to deal with industrial corporations of $1,000,000 any court would hold that the inclusion by name of banks and trust companies in one instance excluded them from general provisions in the other, and in addition, banks and trust companies are not such corporations [that are in competition with industrial corporations]. The conferees having redrafted the matter, having gotten away from the language of section 9 of the House and section 7 of the Senate in many particulars concluded that it would leave no matter of argument touching the language of section 7 *and therefore the conferees inserted in the exclusion proviso what would have been held as excluded in the bill agreed to in*

*conference even if not put there, to wit "banks, banking associations, and trust companies," thus making it plain by the very expression itself that they, along with common carriers, were not within the group outlined as industrial corporations.* [51 Cong.Rec. 16271–16272. (Emphasis added).]

These explanations were not, however, satisfactory to Mr. Mann. He rejoined as follows:

Mr. Speaker, I do not think the gentleman from North Carolina or the gentleman from Kentucky quite appreciate what the House did in the bill which it passed, and yet they should know more about it than I do.

.　　.　　.　　.　　.

[Section 7 of the original House bill] applies to all corporations except common carriers subject to the act to regulate interstate commerce and forbidding any person to be a director in two corporations either one of which has a capital over a million dollars. That applies to a director in a bank and a director in a manufacturing institution. That prohibits a director of a bank with a capital of million dollars in New York City being also a director in the Sugar Trust Company or in any other company. That provision would have prevented Mr. Gary, an officer of the United States Steel Corporation, from being a director in a bank. He has recognized that far enough, supposing it would become a law, according to newspaper reports, by resigning from these and other directorates. *That provision was not limited as to any corporation with a capital of over a million dollars except as to common carriers, and the common carrier provision is otherwise provided for by law. It extended to banks, to industrial corporations, to all kinds of corporations.* The gentleman from Kentucky and the gentleman from North Carolina both said it applied only to industrial corporations. I do not know where they get a warrant for that. It is not in the bill.

.　　.　　.　　.　　.

. . . There was no place in the bill except section 7 where there was a prohibition against a director of an industrial corporation being also the director of a bank. It certainly will not be contended by anyone on the floor of this House that after the Money Trust investigation, which cost such a large sum of money and which excited so much attention, an antitrust bill was passed through this House without any prohibition against a bank director also a controlling an industrial corporation to which his bank was loaning money or that an industrial corporation with bank deposits could have as a director in that bank one of its own directors, who should control the supply of money which was being deposited. [51 Cong.Rec. 16272 (emphasis added).]

At the close of Mr. Mann's speech, the following question was put to him from the floor.

Take another case, where a large banking institution has directors who are also directors of a large manufacturing institution. What would be the effect in that case?

Mr. Mann responded,

If the language as perfected by the House and the Senate *goes into effect without the change made by the conferees*, there would be a provision against men acting as directors of a bank and a hat company, if there were any sort of competition. Of course, this bill does not apply to railroad companies [common carriers] engaged in commerce. [51 Cong. Rec. 16272–73 (emphasis added).]

This exchange was followed by a few more questions from the Speaker, after which, the Speaker indicated he was ready to rule on Mr. Mann's point of order.

The Chair is ready to rule. In passing on this point of order, of course, *the Chair has nothing to do whatever with the wisdom or advisability of this legislation* in whole or in part. The only question is, Did the Conferees exceed their authority by this language which they put in as amendment by the conferees to Senate amendment number 43. The words add-

ed by the conferees are these: "banks, banking associations, trust companies, and." It is well established and everybody who has paid any attention to it knows it, that the conferees cannot go out and drag in new subjects of legislation. . . . [Now in the instant case,] the House passed a bill regulating [interlocking directorates of banks]. The Senate struck it all out. The House never agreed to the Senate amendment striking out the House language. Therefore, in the judgment of the Chair without elaborating this opinion . . . *that subject was lawfully before the conferees. If any gentleman does not like the conference report, he has his remedy—to vote against it.* The Chair thinks the conferees did not exceed their authority, and the point of order is overruled. [51 Cong.Rec. 16273.]

Further debate not relevant here, followed the Speaker's ruling, and the bill was passed the next day, and then enacted into law on October 15, 1914.

8. *Summary and evaluation of legislative history.* We draw the following conclusions from the foregoing description of legislative history. Notwithstanding Representative Mann's plea to the contrary, there is considerable evidence that, even ignoring "the other than banks" language, Congress never intended the fourth paragraph of section 8 to apply to banks. Yet, even assuming this evidence to be inconclusive, there can be no doubt that the insertion of the "other than banks language" into the fourth paragraph of section 8 had the effect of completely excluding banks from that section's prohibition. This is expressly acknowledged by Representative Mann, who accuses the Conference Committee of exceeding its authority by inserting that phrase. It is clearly the view of Congressmen Webb and Sherley, who would have interpreted section 8 in this manner even without the "other than banks" language. It is implicitly acknowledged by the House Speaker, who after hearing the above-mentioned Congressmen debate the propriety of inserting this language, over-

ruled Representative Mann's point of order, cautioning that the ruling should in no way be construed as an indication of the Speaker's view as to the wisdom or advisability of passing the bill. Moreover, the use of similar language in conjunction with common carriers has clearly had the effect of excluding that particular type of company from paragraph 4's reach. In short, there is not one statement by anyone in Congress that supports the Government's argument that the "other than banks" language meant only to exclude bank/bank interlocks but not bank/nonbank interlocks. To the contrary, the legislative history shows that there were serious efforts made by the Senate to block the regulation of even bank/bank interlocks. Only the compromise described by Congressman Sherley was able to get that part of section 8 through Congress. Accordingly, it seems clear that the Senate, if not the House, would never have agreed to have enacted section 8 if it thought that banks were to be regulated in the fourth paragraph of section 8, as well as in the first three.

We note that the Government attaches far less significance to the foregoing descriptions of legislative history. It instead emphasizes the background from which section 8 grew. See pp. 16–17 supra. It particularly stresses the House and Senate Report's incorporation of President Wilson's message on interlocking directorates in which he demanded legislation to prohibit interlocking directorates among "banks and railroads, industrial, commercial and public service bodies." See p. 16 supra. These are, however, the same sources which Congressman Mann unsuccessfully relied upon in arguing to the House that the "other than banks language" be removed from section 8. See pp. 22, 25 supra.

The Government also questions the inferences and conclusions which we draw from the legislative history. It argues that statements made in legislative debate are peculiarly unreliable in determining Congressional intent. See United States v. Sears Roebuck & Co., 111 F.Supp. 614 (S.D. N.Y.1953). See also Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (Jackson, J., concurring). We are aware of the problems which the courts in those cases described and experienced in interpreting legislative history; nevertheless, it is the opinion of this court that the legislative history underlying section 8 is not susceptible of the same double meaning and ambiguities that confronted those courts.[20]

It shall be unlawful for any person to be at the same time, a member of the board of directors, or other managing board, or an officer of two or more corporations, either of which is engaged in commerce, and which corporations are carrying on business of the same kind or competitive in character: Provided, That this paragraph shall not apply to banks, banking

---

20. In contrast, for example, to the legislative history at issue in the Sears Roebuck case, the House Debate previously described and subsequent overruling of Congressman Mann's point of order are very instructive as to the meaning of the "other than banks" language in section 8.

The Sears Roebuck case was the first instance in which a court was called upon to construe the meaning of the competition requirement in the fourth paragraph of section 8:

No person . . . shall be a director in any two or more corporations . . . if such corporations are or shall have been . . . competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws.

Defendants there contended that this language should be read to require a finding that a hypothetical merger between two corporations would violate the antitrust laws before the prohibition of section 8 would be applicable. In support of this contention defendants relied primarily upon the statements and conduct of Senator Cummings of the Committee on the Judiciary during the Senate debates on section 8. In arguing against the inclusion of the "so that" clause in the bill, Senator Cummings stated "[this clause] means practically that if a consolidation of the corporations would be a violation of the antitrust laws, then interlocking directorates are made unlawful." 51 Cong. Rec. 14256. No other member of the Senate stated his agreement or disagreement with Senator Cummings' view as to the meaning of this clause. A week later, Senator Cummings offered the following amendment to section 8, which was defeated that day by a 44 to 15 vote, with 37 not voting.

institutions or common carriers. [*Id.* at 14534.]

Judge Weinfeld accordingly noted the problems with speculating whether Congress defeated the bill because it agreed with Senator Cummings earlier interpretation of section 8 and intended the bill to have that effect: First, no member of Congress ever expressed any opinion on whether Senator Cummings' interpretation of section 8 was correct. Second, the bill that he proposed changed the interlocking directorates provision in many respects: It eliminated the $1,000,000 requirement; it proscribed interlocks between officers as well as directors; and, it only required one of the corporations to be involved in interstate commerce. Accordingly, a vote against Senator Cummings' amendment could have simply been indicative of Congress's displeasure with any or all of these changes.

By way of contrast, Congressman Mann's point of order sparked extensive debate in which all parties that spoke concurred in his suggestion that the "other than banks" language had the effect of removing banks from the prohibition of section 8's fourth paragraph. The only question which was argued was whether the decision to insert this language was in excess of the Conference Committee's authority. After extensive debate on this issue, the Speaker of the House overruled Representative Mann's point of order. It is, of course, theoretically possible that this point of order was overruled because Representative Mann's interpretation of the "other than banks language" was not thought to be correct. This is, however, extremely unlikely since, as just described, no member of Congress ever made this contention, and all those who participated in the debate concurred with Congressman Mann's characterization of the language's effect. Moreover, unlike Senator Cummings' amendment which addressed four different points, Representative Mann's point of order was raised solely

with regard to the propriety of inserting the "other than banks" language into the bill.

Finally, the Government argues that even assuming that the legislative history does reflect a Congressional intention to treat banks differently than the "industrial corporations," which clearly are subject to the prohibition of paragraph 4 of section 8, this differential treatment resulted solely from Congress's feeling that banks were not subject to Congress's Commerce Clause power. Hence, relying on *Trans-America Corp. v. Board of Governors*, 206 F.2d 163 (3d Cir.) *cert. denied* 346 U.S. 901, 74 S.Ct. 225, 98 L.Ed. 401 (1953), the Government argues that as long as it is now established that banks can be regulated pursuant to the Commerce Clause [21] and that Congress intended to exercise its commerce clause power to the fullest extent possible,[22] then it is irrelevant whether Congress, at the time the Clayton Act was enacted, contemplated that banks would be reachable under that power. While that is the teaching of *Trans-America*, the finding there that banks were corporations engaged in commerce and therefore within the purview of section 7, was predicated upon the fact that the "sweep [of section 7] includes all 'corporations engaged in commerce' without exception." 206 F.2d at 165. Section 8, however, unlike section 7, does not "includes all 'corporations engaged in commerce' without exception." Banks, banking associations, trust companies and common carriers are specifically excepted. Moreover, to argue that banks were specifically excluded from section 8 solely because of Congress's feeling that they were not subject to regulation under the commerce clause overlooks the following facts: First, Congress did not so specifically exempt banks from section 7, which was passed at the same time as section 8; and second, Congress specifically excepted common carriers from the fourth paragraph of section 8 in the same clause in which banks were excepted, though com-

---

**21.** *See United States v. Philadelphia Nat'l Bank, supra.*

**22.** Relying on the words "engaged in whole or in part in commerce" the Government argues that this was Congress's intent in enacting the fourth paragraph of section 8.

mon carriers were clearly subject to Congress's Commerce Clause power.

Thus, we are not persuaded that our reliance on section 8's legislative history is misplaced.

### E. *Public Policy Arguments*

Underlying all the Government's arguments regarding the proper manner in which to interpret the fourth paragraph of section 8 is their contention that to interpret section 8 as excepting bank/nonbank interlocks would leave a loophole in the statute which itself was in part designed to plug gaps that existed in the Sherman Act. *See e. g., Brown Shoe Co. v. United States,* 370 U.S. 294, 318 n. 32, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Thus, the Government argues Congress could not have intended to create such an exception which would be both contrary to public policy and the overall purpose of section 8 to alleviate and address the widespread public concern over the anticompetitive effects of the nation's vast interlocking directorates.

However, as is apparent from our description of the legislative history underlying section 8, Congress's decision to except banks, banking associations, trust companies and common carriers from section 8 does not appear to have been inadvertent. Moreover, contrary to the Government's argument, there are legitimate public policies to be served from excepting banks and insurance company interlocks from section 8's prohibition. As Arthur Burns, Chairman of the Federal Reserve Board, testified before Congress:

> [E]conomic benefits flow from a high standard of performance by corporate boards of directors. This entails a free exchange of advice, ideas, and experiences among directors of varied backgrounds. Bankers often have valuable experience and expertise that qualify them to render valuable service in this role. Interlocking directorates, in other words, are not inherently wrong. They may be good for the corporations involved and the public they serve. The problem is to define those situations where the risk of abuse outweighs the expectation of benefit. (Letter of Dr. Arthur Burns to Wright Patman, Ch. House Comm. on Banking Currency, Dec. 16, 1970, quoted in Hearings on H.R. 5700 Before the House Comm. on Banking and Currency, 92nd Cong., 1st Sess. 481 (1971).)

Defendants further emphasize that the need for competent directors with solid financial backgrounds is particularly acute in the case of insurance companies. These companies are entrusted with funds of millions of policyholders. The obligation to pay benefits to the policyholders may not mature for periods as long as 50 years. It is the responsibility of the directors of insurance companies to ensure that funds of their policyholders are prudently invested to permit the companies to meet such obligations and to provide the financial security which their policyholders seek. Hence it is essential that the board of directors of insurance companies include individuals who have investment experience, particularly in the lending area, and who can exercise expert judgment concerning the investment activities of the company. Accordingly, categorically banning directors of banks and other lending institutions from serving on the boards of directors of insurance companies could clearly reduce the number of qualified directors, possibly to the detriment of the public at large.

This is not to say, of course, and this court does not intend to suggest, that other factors do not exist that could nevertheless justify prohibiting the "bank interlocks" challenged here. However, arguments of this kind are more properly directed at Congress than at this court. While this court itself might not have chosen to except bank/insurance interlocks from federal regulation, the language of section 8 is neither so ambiguous nor purposeless that this court can do other than to give it the effect that Congress has intended.

### F. *Summary*

It is apparent from the plain language of the statute that the fourth paragraph of

section 8 of the Clayton Act does not apply to the bank/insurance company interlocks challenged here.[23] While this may itself be controlling, see e. g., United States v. Oregon, 366 U.S. 643, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961), this interpretation is further confirmed by 60 years of administrative and Congressional interpretation, as well as by the legislative history underlying section 8. In so holding, we are not unmindful of the general rule that "[i]mmunity from the antitrust laws is not lightly implied." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 348, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963). However, given the express language of section 8, we question whether we are "implying" the immunity of banks from the fourth paragraph of section 8. Moreover, even if we are so implying such immunity, we think there is more than a sufficient basis in the record to justify this action.

## II. ARE DIRECTOR INTERLOCKS BETWEEN BANK HOLDING COMPANIES AND INSURANCE COMPANIES PROHIBITED BY SECTION 8 OF THE CLAYTON ACT?

As was true with respect to "bank interlocks," the Government's attack on the instant "bank holding interlocks" is founded solely upon the prohibition contained in the fourth paragraph of section 8 of the Clayton Act. Accordingly, the stipulated record concedes the existence of the challenged interlocks, the requisite amount of capital, and the companies' engagement in interstate commerce. *See* notes 2–4 *supra* and accompanying text. The primary question presented by this phase of the Government's suit is whether the defendant companies "are or shall have been theretofore, by virtue of their business and location of operation, competitors, *so that* the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws."

The Government's first and most basic argument in this regard is that since the defendant corporations are capable of entering into an anticompetitive agreement (for example, to fix interest rates) they are competitors. This argument, however, is based upon the erroneous theory that the "so that" clause of section 8 defines competitors as "two corporations which could enter into an agreement to eliminate competition and thereby violate the antitrust laws." Gov't Reply Brief, p. 51.

An examination of the relevant statutory language set forth above reveals that the "so that" clause does not purport on its face to be, and is in fact not, a definition of the term competitors. Moreover, were that clause to be interpreted as defining the term "competitors," it would lead to the analogous result of declaring companies with vertical relationships, such as manufacturers and distributors, to be competitors.

The real purpose of the "so that" clause seems to have been the establishment of a *per se* rule that interlocking directorates among competing corporations (that otherwise meet the requirements of the fourth paragraph of section 8) are illegal. *See* 16B Von Kalinowski, *supra*, at § 20.02[2], p. 20–19. Section 8 of the Clayton Act was intended to nip in the bud incipient antitrust violations by removing the opportunity or temptation for such violations through interlocking directorates. *United States v. Sears Roebuck & Co.*, 111 F.Supp. at 616. Thus, in furtherance of this purpose, Congress sought to avoid questions as to whether the competition which interlocking directorates could potentially restrain was substantial or de minimus. As long as corporations were "competitors" and otherwise satisfied the criteria set forth in section 8, they could not simultaneously employ the same director. Whether two corporations were, in fact, competitors was apparently to be determined according to the traditional

---

**23.** We, of course, intimate no views as to whether these interlocks could successfully be attacked as Sherman Act violations or as violations of section 5 of the Federal Trade Commission Act. *See generally*, Travers, "Interlocks in Corporate Management and the Antitrust Laws," 46 Texas L.Rev. 819, 848 (1968); Jacobs, "Interlocks," 29 *A.B.A. Antitrust Sections* 204, 212 (1965).

tests of competition—common sales in the same *product* and *geographic* market. This is the import of the phrase "by virtue of their *business* and *location* of operation."

Here, the stipulated record removes the need to examine these specific criteria. It reveals that the bank holding companies by themselves or through their subsidiaries, *other than the bank defendants named herein*, are not competitors of any of the insurance company defendants so that the elimination of competition by agreement between them would constitute a violation of one or more of the provisions of the antitrust laws. *See* note 6 *supra* and accompanying text. Hence, the Government's second and only other argument in support of its attack on the bank holding interlocks is that the activities of the bank holding companies' subsidiary banks are sufficient to make the bank holding companies themselves competitors of the insurance company defendants. The Government relies on the following portions of the stipulated record in making this argument.

It notes first that the bank defendants named in these suits are conceded to be competitors within the parameters required by section 8. *See* note 4 *supra* and accompanying text. It further notes that the bank holding defendants are bank holding companies registered under the Bank Holding Company Act as amended 12 U.S.C. §§ 1841–44, thus, establishing the fact that they control their subsidiary banks. *See* note 5 *supra* and accompanying text. By virtue of this control, the Government contends the activities of the subsidiary banks must be attributed to their holding companies, thereby making them competitors of the insurance company defendants.

Defendants dispute that the control which the holding companies have over their banks is sufficient to attribute the operations of those banks to the holding companies. Defendants argue that while the stipulated record concedes that the bank holding companies control their subsidiaries by and through the ownership of those subsidiaries' stock and the election of all of their subsidiaries' directors, the record also reveals that it is the bank officers, and not the bank directors, who control the daily operations and activities of the banks. *See* note 6 *supra* and accompanying text. It is defendants' further contention that in order to attribute the banks' operation to their holding companies, the holding companies must be shown to control their subsidiaries' day-to-day operations, and that the record does not provide a sufficient basis from which such a showing could be made.

We need not, however, resolve this issue. Even assuming that the control which the bank holding companies exercised over their subsidiary banks was sufficient to attribute the subsidiary banks' activities to their parents, it seems that the subsidiaries' status as banks, and hence their exemption from the fourth paragraph of section 8, should similarly be attributed to those parents. As the Government makes clear in oral argument, its attack on the "bank holding interlocks" is predicated upon, and is subordinate to, their attack upon the "bank interlocks." *See* Transcript, pp. 45, 59. The Government argues that if there is to be an injunction against bank and nonbank interlocks, it would be anomalous not to also enjoin the bank holding interlocks given the measure of control which exists. *Id.* at 59. Similarly, the Government in effect concedes that, if this court decides that section 8 *does not* apply to the challenged bank interlocks, it would be anomalous to conclude that section 8 applies to the bank holding interlocks. *See* Transcript at 45–46.[24] Otherwise, it would mean that interlocks between banks and directly competing insurance companies would be lawful by virtue of the "other than banks" language of the fourth para-

24. The only qualification which the Government offered in this regard concerned the possibility that if an exemption for banks from the fourth paragraph of section 8 was the result of Congress's inadvertent or unwitting action, then it would not necessarily be anomalous to have applied the fourth paragraph of section 8 to the bank-holding interlocks. However, as is set forth in our discussion of the bank interlock question, the exemption of banks from the prohibition of the fourth paragraph of section 8 was neither inadvertent nor unwitting.

graph of section 8, but that interlocks between bank holding and insurance companies involving only vicariously attributed indirect competition would be prohibited. Accordingly, we hold that if the activities of the defendant subsidiary banks are required to be attributed to their parents, so too must their status as banks, and hence their exemption from the fourth paragraph of section 8. We further note that this type of attribution of a subsidiary bank's status to its parent is not without precedent. For example, pursuant to its authority to promulgate rules and regulations to effectuate the provisions of section 8 of the Clayton Act, see 15 U.S.C. §§ 19, 21(a), the Board of Governors of the Federal Reserve Board has already issued regulations which treat bank holding companies as banks for some purposes of section 8. See 12 C.F.R. 212.102. See also 12 C.F.R. 212.101.

Thus, under the circumstances of this case, we hold that the challenged bank holding interlocks do not violate section 8 of the Clayton Act.[25]

25. In so holding, we do not decide the broader question of whether section 8 generally applies to indirect interlocks.

Indirect interlocks generally fall into three categories: (1) Those, as here, where the interlock is direct but the alleged competition is indirect in that it is based solely on the operation of a separate, but affiliated corporation; (2) those where the interlock is indirect, but the alleged competition is direct; and (3) those where both the interlock and the alleged competition is indirect. To be sure, most courts, commentators, and administrative Congressional bodies who have considered this question have concluded that section 8 does not reach indirect interlocks. See e. g., Paramount Pictures Corp. v. Baldwin Montrose Chem. Co., 1966 Trade Cases ¶ 71,678 (S.D.N.Y.1966); United States v. Sears Roebuck & Co., 165 F.Supp. 356 (S.D.N.Y.1958); 16B Von Kalinowski supra at § 20.02[3][a]; Kramer, "Interlocking Directorates and the Clayton Act After 35 Years", 59 Yale L.J. 1226, 1274 (1950); Travers, "Interlocks in Corporate Management and the Antitrust Laws," 46 Texas L.Rev. 819 (1968); Jacobs, "Interlocks" 29 A.B.A. Antitrust Section 204, 212 (1965); Report of the Federal Trade Commission on Interlocking Directors, H.R.Doc.No.652, 81st Cong., 2d Sess., pp. 10, 14, 15, 18 (1950); Staff of House Committee on the Judiciary (Antitrust Subcommittee), 89th Cong., 1st Sess., Report on Interlocks in Corporate Management (Comm. Print 1965).

## III. THE REMAINING ISSUES

In view of our disposition of the first two issues discussed, it is apparent that defendants' motions for summary judgment must be granted. Accordingly, we need not reach and therefore will not discuss in any detail the remaining issues that these motions present except to quickly note our disagreement with defendants' position with respect to these issues should they become relevant on appeal.

### A. Are Corporations Subject to the Prohibition of the Fourth Paragraph of Section 8?

Defendants contend that section 8 only proscribes a "person" from serving as a director of two or more competing corporations, and that it does not apply to either of the two corporations whose stockholders or policyholders may have separately and independently elected the same person to serve as a director on their respective boards.[26] Regardless of whether this contention is

See also H.R. 11572, 89th Cong., 1st Sess. (1965). But see Schectmann v. Wolfson, Civ. Nos. 105–300 (S.D.N.Y. Jan. 1956) mentioned without comment in Schectmann v. Wolfson, 244 F.2d 537 (2d Cir. 1957). Though these conclusions are probably correct with respect to the types of indirect interlocks described as (2) and (3) above, we entertain some doubts as to whether they are necessarily correct with regard to all type (1) indirect interlocks.

For example, in attacking the bank-holding interlocks at issue here, the Government relies on the express language of section 8. It contends that the bank holding company defendants are competitors of the insurance company defendants by virtue of their business; to wit, the business of being a bank holding company and controlling the operations of its subsidiary banks. Thus, were this court of the opinion that the underlying bank interlocks challenged here were illegal, it would seem that a strong case could be built for holding that section 8 reached this particular type of indirect interlock as well. See Kramer supra at 1268 n. 11.

Also see note 22 supra.

26. Although section 1 of the Clayton Act defines "person" so as to include corporations as well as natural persons, defendants note that the explicit language of section 8 limits the prohibition to a "person" who is a "director" in two competing corporations. There is no contention here that any of the defendant corporations are actually "directors."

correct,[27] it is clear, and the defendants conceded at oral argument,[28] that were this court to decide that injunctive relief were appropriate in these cases, this court could, if it chose to, enjoin the defendant corporations, as well as the individual defendants from further violating section 8. *See e. g.,* 15 U.S.C. § 25.

B. *Are the Challenged Interlocks Immunized from Prosecution Under Section 8 of the Clayton Act by Virtue of the Antitrust Exemption Provided in the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015?*

■ The McCarran-Ferguson Act exempts the business of insurance from federal regulation to the extent that is regulated by the states. Here, the McCarran Ferguson exemption is not applicable since the selection of directors to insurance companies are not acts so "peculiar to the insurance industry" as to come within the meaning of the business of insurance as used in the McCarran-Ferguson Act and cases interpreting that statute. *See American Family Life Assurance Co. v. Planned Mktg. Assoc. Inc.,* 389 F.Supp. 1141 (E.D. Va.1974). *See also SEC v. Nat'l Securities Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); *DeVoto v. Pacific Fidelity Life Insurance Co.,* 354 F.Supp. 874 (N.D.Cal. 1973) *aff'd* (and revs'd on other grounds) 516 F.2d 1 (9th Cir.) *cert. denied,* 423 U.S. 894, 96 S.Ct. 194, 46 L.Ed.2d 126, 44 U.S. L.W. 3229 (1975); *American General Insurance v. FTC,* 359 F.Supp. 887 (S.D.Texas 1973) *aff'd* 496 F.2d 197 (5th Cir. 1974).

## CONCLUSION AND ORDER

For the reasons set forth in this opinion, it is hereby ordered that defendants' motion for summary judgment be granted.

IT IS SO ORDERED.

## APPENDIX

I. Section 8 of The Clayton Act

(15 U.S.C. § 19)

### § 19. Interlocking directorates and officers

No private banker or director, officer or employee of any member bank of the Federal Reserve System or any branch thereof shall be at the same time a director, officer, or employee of any other bank, banking association, savings bank, or trust company organized under the National Bank Act or organized under the laws of any State or of the District of Columbia, or any branch thereof, except that the Board of Governors of the Federal Reserve System may by regulation permit such service as a director, officer, or employee of not more than one other such institution or branch thereof; but the foregoing prohibition shall not apply in the case of any one or more of the following or any branch thereof:

(1) A bank, banking association, savings bank, or trust company, more than 90 per centum of the stock of which is owned directly or indirectly by the United States or by any corporation of which the United States directly or indirectly owns more than 90 per centum of the stock.

(2) A bank, banking association, savings bank, or trust company which had been placed formally in liquidation or which is in the hands of a receiver, conservator, or other official exercising similar functions.

(3) A corporation, principally engaged in international or foreign banking or banking in a dependency or insular possession of the United States which has entered into an agreement with the Board of Governors of the Federal Reserve System pursuant to sections 601 to 604a of Title 12.

(4) A bank, banking association, savings bank, or trust company, more than 50 per centum of the common stock of which is owned directly or indirectly by persons who own directly or indirectly

---

**27.** The United States Supreme Court explicitly left this question unresolved in *United States v. W. T. Grant & Co.,* 345 U.S. 629, 635 n. 9, 73 S.Ct. 894, 97 L.Ed. 1303.

**28.** *See* Transcript at 62.

more than 50 per centum of the common stock of such member bank.

(5) A bank, banking association, savings bank, or trust company not located and having no branch in the same city, town, or village as that in which such member bank or any branch thereof is located, or in any city, town, or village contiguous or adjacent thereto.

(6) A bank, banking association, savings bank, or trust company not engaged in a class or classes of business in which such member bank is engaged.

(7) A mutual savings bank having no capital stock.

Until February 1, 1939, nothing in this section shall prohibit any director, officer, or employee of any member bank of the Federal Reserve System, or any branch thereof, who is lawfully serving at the same time as a private banker or as a director, officer, or employee of any other bank, banking association, savings bank, or trust company, or any branch thereof, on August 23, 1935, from continuing such service.

The Board of Governors of the Federal Reserve System is authorized and directed to enforce compliance with this section, and to prescribe such rules and regulations as it deems necessary for that purpose.

No person at the same time shall be a director in any two or more corporations, any one of which has capital, surplus, and undivided profits aggregating more than $1,000,000, engaged in whole or in part in commerce, other than banks, banking associations, trust companies, and common carriers subject to the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws. The eligibility of a director under the foregoing provision shall be determined by the aggregate amount of the capital, surplus, and undivided profits, exclusive of dividends declared but not paid to stockholders, at the end of the fiscal year of said corporation next preceding the election of directors, and when a director has been elected in accordance with the provisions of this Act it shall be lawful for him to continue as such for one year thereafter.

When any person elected or chosen as a director or officer or selected as an employee of any bank or other corporation subject to the provisions of this Act is eligible at the time of his election or selection to act for such bank or other corporation in such capacity his eligibility to act in such capacity shall not be affected and he shall not become or be deemed amenable to any of the provisions hereof by reason of any change in the affairs of such bank or other corporation from whatsoever cause, whether specifically excepted by any of the provisions hereof or not, until the expiration of one year from the date of his election or employment.

Oct. 15, 1914, c. 323, § 8, 38 Stat. 732; May 15, 1916, c. 120, 39 Stat. 121; May 26, 1920, c. 206, 41 Stat. 626; Mar. 9, 1928, c. 165, 45 Stat. 253; Mar. 2, 1929, c. 581, 45 Stat. 1536; Aug. 23, 1935, c. 614, § 329, 49 Stat. 717.

## II.   Section 10 of The Clayton Act
(15 U.S.C. § 20)

### § 20. Purchases by common carriers in case of interlocking directorates, etc.

No common carrier engaged in commerce shall have any dealings in securities, supplies, or other articles of commerce, or shall make or have any contracts for construction or maintenance of any kind, to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, firm, partnership, or association when the said common carrier shall have upon its board of directors or as its president, manager, or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager, or purchasing or selling officer of, or who has any substantial interest in, such other corporation, firm, partnership, or as-

sociation, unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission. No bid shall be received unless the name and address of the bidder or the names and addresses of the officers, directors, and general managers thereof, if the bidder be a corporation or of the members, if it be a partnership or firm, be given with the bid.

Any person who shall, directly or indirectly, do or attempt to do anything to prevent anyone from bidding, or shall do any act to prevent free and fair competition among the bidders or those desiring to bid, shall be punished as prescribed in this section in the case of an officer or director.

Every such common carrier having any such transactions or making any such purchases shall, within thirty days after making the same, file with the Interstate Commerce Commission a full and detailed statement of the transaction showing the manner of the competitive. bidding, who were the bidders, and the names and addresses of the directors and officers of the corporations and the members of the firm or partnership bidding; and whenever the said commission shall, after investigation or hearing, have reason to believe that the law has been violated in and about the said purchases or transactions, it shall transmit all papers and documents and its own views or findings regarding the transaction to the Attorney General.

If any common carrier shall violate this section, it shall be fined not exceeding $25,-000; and every such director, agent, manager, or officer thereof who shall have knowingly voted for or directed the act constituting such violation, or who shall have aided or abetted in such violation, shall be deemed guilty of a misdemeanor and shall be fined not exceeding $5,000 or confined in jail not exceeding one year, or both, in the discretion of the court.

Oct. 15, 1914, c. 323, § 10, 38 Stat. 734.