TRW, INC., and Horace A.
Shepard, Petitioners,

v.

The FEDERAL TRADE COMMISSION,
Respondent.

No. 79–7209.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 9, 1981.

Decided June 8, 1981.

Robert H. Rawson, Jr., Jones, Day, Reavis & Pogue, Cleveland, Ohio, for petitioners.

Charles David Nelson, Washington, D. C., for respondent.

Before TRASK and SNEED, Circuit Judges, and THOMPSON *, District Judge.

SNEED, Circuit Judge:

TRW, Inc., and Horace A. Shepard petition for review of a final order of the Federal Trade Commission requiring them to cease and desist from violating section 8 of the Clayton Act, 15 U.S.C. § 19, proscribing interlocking directorates. Our jurisdiction is authorized by section 11(c) of the Clayton Act, 15 U.S.C. § 21(c). We affirm the Commission's finding of a section 8 violation as to both petitioners and reject the various defenses of the petitioners. However, because the Commission erred in assessing the need for prospective relief, we set aside the cease and desist orders.

* Honorable Bruce R. Thompson, Senior United States District Judge for the District of Nevada, sitting by designation.

## I.

### STATEMENT OF THE CASE

Horace Shepard has been associated with TRW since 1951 and served as chief executive officer from 1969 to 1977. He joined TRW's board in 1957 and is eligible to remain on the board until 1984 on the date of his seventy-second birthday. On March 20, 1971, Shepard also was elected to the board of the Addressograph-Multigraph Corp. (A–M). He served on the A–M board until November 6, 1975. During this period Shepard maintained his position as a TRW director.

On June 17, 1976, the Federal Trade Commission voted to issue a complaint against TRW, Shepard, and A–M, charging them with violations of section 8 of the Clayton Act and section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45 (a)(1).[1] Section 8 provides, in relevant part:

No person at the same time shall be a director in any two or more corporations, any one of which has capital, surplus, and undivided profits aggregating more than $1,000,000, engaged in whole or in part in commerce, . . . if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws.

The complaint was referred to an administrative law judge (ALJ), who found that Shepard's simultaneous membership on the boards of TRW and A–M during the period January 1, 1973, to November 6, 1975, violated section 8. Prior to the ALJ's decision, A–M had removed itself from the case by entering into a consent order with the Commission. The ALJ issued a cease and desist order against Shepard, but declined to issue one against TRW, principally on the ground that the company had taken no active role in sanctioning Shepard's assumption of the A–M directorship.[2] On appeal the Commission affirmed the issuance of an order against Shepard, but reversed the ALJ and also issued an order against TRW, enjoining it from further violations of section 8 and requiring it to file annual compliance reports. *In re TRW, Inc.*, 93 F.T.C. 325 (1979). Both Shepard and TRW have petitioned this court for review. The central issue, and the one to which we turn initially, is whether the Commission's finding that TRW and A–M were "competitors" for purposes of section 8 is correct.

## II.

### THE MEANING Of "COMPETITORS"

Section 8 of the Clayton Act proscribes interlocking directorates only between corporations that are "competitors".[3] Petitioners argue that TRW and A–M have never been *actual* competitors and that the Commission at best found the companies to be *potential* competitors, a finding the petitioners argue is insufficient to support a

---

**1.** The Commission affirmed the finding of the administrative law judge that petitioners' violation of section 8 of the Clayton Act also constituted a violation of section 5 of the FTC Act. *In re TRW, Inc.*, 93 F.T.C. 325, 386 n.22 (1979). Because we affirm the Commission's finding of a section 8 violation as to both petitioners, we need not decide whether an interlock that does not violate section 8 may nonetheless violate section 5.

**2.** The Initial Decision of the ALJ appears at 93 F.T.C. 326–72 (1979).

**3.** Section 8 establishes three other preconditions to its bar against interlocking directorates. First, at least one of the corporations must have "capital, surplus, and undivided assets aggregating more than $1,000,000." Second, the corporations must be "engaged in

whole or in part in commerce." Third, it must be possible for an agreement between the corporations eliminating competition between them to violate "any of the provisions of any of the antitrust laws." None of these requirements is at issue on appeal.

The FTC's complaint counsel argued before both the ALJ and the Commission that the proviso of section 8, which reads "so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws," is not really a separate requirement. Instead, it was argued that this proviso defines what is meant by "competitors." Both the ALJ and the Commission rejected this interpretation, and it has not been argued by either party on appeal.

section 8 violation. The respondent maintains that "the Commission made no finding concerning potential competition but rather based its decision upon record evidence showing actual competition between TRW and A–M." We believe that the respondent correctly characterizes the Commission's opinion. Therefore, we confront two questions: (1) did the Commission apply the correct legal standard for determining actual competition;[4] and (2) if so, is the Commission's finding of actual competition supported by substantial evidence.[5] *See* 15 U.S.C. § 21(c). We hold that both questions should be answered affirmatively. TRW and A–M were actual competitors for purposes of section 8.

### A. *The Standard for Determining Competition*

The meaning of "competitors" for purposes of section 8 is a question of first impression in this court.[6] No reported decision of which we are aware has directly addressed the question, primarily because competition has been stipulated in the few reported cases. In its opinion the Commission never expressly formulated a "test" for determining whether two corporations are competitors. However, it did emphasize the following factors: (1) the products marketed by TRW and A–M performed the same generic functions (point-of-sale credit authorization and electronic funds transfer), 93 F.T.C. at 380–81; (2) the two companies "vied for the business of the same purchasers," *id.* at 381; (3) they "attempt[ed] to convince" the same purchasers that their products best suited the purchasers' specific needs, *id.* at 381–82; and (4) they attempted or offered to modify their existing equipment to meet purchaser needs, *id.* at 383. The Commission acknowledged, however, that TRW and A–M did not make common sales to the same purchasers. Thus, in the eyes of the Commission, "competitors" are companies that vie for the business of the same prospective purchasers, even if the products they offer, unless modified, are sufficiently dissimilar to preclude a single purchaser from having a choice of a suitable product from each.

The petitioners argue that substantially greater similarity between the competing products is required. "Competitors" make common sales to the same purchaser or class of purchasers; their products generally meet similar needs and principally differ only in price or quality. Accordingly, they argue that the question should be judged by the standards of cross-elasticity of demand and reasonable interchangeability of use commonly employed in defining markets for purposes of the Sherman Act and Section 7 of the Clayton Act. *See, e. g., Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962); *Twin City SportService, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1271 (9th Cir. 1975).

■ Statutory language should be construed in accordance with its underlying purpose. The purpose of section 8 was "to nip in the bud incipient antitrust violations

---

**4.** Accordingly, we express no opinion about whether section 8 encompasses interlocking directorates between corporations that are merely potential competitors.

**5.** Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). *See Equifax, Inc. v. FTC*, 618 F.2d 63, 64 (9th Cir. 1980). " 'This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.' " *United States v. Wharton*, 514 F.2d 406, 409 n.3 (9th Cir. 1975) (quoting

*Consolo, supra*, 383 U.S. at 620, 86 S.Ct. at 1026).

**6.** In *Las Vegas Sun v. Summa Corp.*, 610 F.2d 614 (9th Cir. 1979), *cert. denied*, 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 854 (1980), we held that corporations were not competitors for purposes of section 8 when they were all owned or controlled by the same man. However, there was no need to develop legal standards for defining "competitors" for section 8 purposes. Instead, reliance was placed on an earlier holding to the effect that the corporations were not competitors for purposes of applying the intraenterprise conspiracy doctrine of § 1 of the Sherman Act, 15 U.S.C. § 1 (1976). *See* 610 F.2d at 617–18.

by removing the opportunity or temptation for such violations through interlocking directorates." *United States v. Crocker National Corp.*, 422 F.Supp. 686, 703 (N.D.Cal. 1976), *appeal docketed*, No. 76–3614 (9th Cir. Dec. 10, 1976). *See United States v. Sears, Roebuck & Co.*, 111 F.Supp. 614, 616 (S.D.N.Y.1953). The Commission is right in asserting that this purpose would not be well served by requiring proof of high cross-elasticity of demand between competing products or low-friction interchangeability of use. Two reasons support this conclusion.

First, market definition for Sherman Act and Clayton Act, section 7, purposes, for which these tests were designed, is used to establish "the locus of competition, within which the anticompetitive effects" of a merger or practice are to be judged. *Brown Shoe Co., supra*, 370 U.S. at 324, 82 S.Ct. at 1523. *See Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291–92 (9th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). Section 8, on the other hand, does not require that such a "locus" be established. Only two alleged "competitors" are involved and proof that the interlock has an actual anticompetitive effect is not required. *Accord, Protectoseal Co. v. Barancik*, 484 F.2d 585, 589 (7th Cir. 1973).

■ Second, the petitioner's recommended standard is too restrictive. To further the purpose of Section 8 there should be reliance not only on the degree of actual interchangeability of use between the products of alleged competitors, but also on evidence concerning (1) the extent to which the industry and its customers recognize the products as separate or competing; (2) the extent to which production techniques for the products are similar; and (3) the extent to which the products can be said to have distinctive customers. *E. g., Equifax, Inc.*

*v. FTC*, 618 F.2d 63, 66–67 (9th Cir. 1980); *Kaplan, supra*, 611 F.2d at 292; *Greyhound Computer Corp. v. IBM*, 559 F.2d 488, 493 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *Twin City SportService, supra*, 512 F.2d at 1271. Only by doing so can we be sure our criteria "are not to be used to obscure competition but to 'recognize competition where, in fact, competition exists.'" *United States v. Continental Can Co.*, 378 U.S. 441, 453, 84 S.Ct. 1738, 1745, 12 L.Ed.2d 953 (1964) (quoting *Brown Shoe, supra*, 370 U.S. at 326, 82 S.Ct. at 1524).

■ Our approach may render more difficult the process of screening potential directors for compliance with section 8. The alternative, however, entails infidelity to the purposes of the statute. Moreover, while the tests of cross-elasticity of demand and interchangeability of use may yield realistic results in well-established industries, they are much less useful in situations such as this case presents.[7] The Commission, we conclude, employed the proper legal standard for determining competition.

### B. *The Evidence*

■ Turning to whether there is substantial evidence to support the Commission's findings, the products and services of TRW and A–M relevant to this litigation are set forth in the Appendix to this opinion. The Commission found that TRW and A–M were competitors in the business of manufacturing and selling equipment used for point-of-sale credit authorization and electronic funds transfer (EFT) between financial institutions.

During the complaint period the marketplace for this type of equipment was in its infancy. Most of the technology was exper-

---

**7.** Cross-elasticity of demand measures the responsiveness of demand for one product to changes in the price of another product. Although measuring cross-elasticities of demand is always difficult, it must be particularly so in a developing industry such as the one involved here where the market is still small, where product variation among firms is just beginning, and where customer needs are far from

standardized. Cross-elasticity of demand in such industries may be immeasurable, but this does not mean that competitors are nonexistent. In addition, we have not been provided with a means of determining when cross-elasticity of demand between two products becomes so small that they cannot be characterized as competitive. The problem, again, is particularly acute in developing industries.

imental or in a developing state. Although potential customers had reasonably firm ideas about their needs, they were not aware of what equipment or which companies might best satisfy them. Accordingly, in most instances both TRW and A–M were solicited as two of many companies investigated by prospective purchasers. Generally, both TRW and A–M responded with presentations, and in some cases representatives from the companies suggested that modifications to satisfy specific customer needs might be possible.

It is true, as petitioners repeatedly emphasize, that in almost all cases, only one of the companies was able to meet the customer's requirements. This is not dispositive, however. In a developing industry in which product variation is just beginning and customer needs are not yet standardized, it is unlikely that two companies will produce products nearly equivalent in their ability to satisfy the needs of a range of customers. Nonetheless, these companies compete. Their competition consists of the struggle to obtain the patronage of the same prospective customers, accompanied by representations of a willingness to modify their respective products. Competition also consists of efforts to make a sale, even if neither succeeds in persuading the buyer to purchase. It was in this manner that TRW and A–M competed. Their willingness to respond to requests regarding credit verification and EFT systems, and in many instances aggressively to pursue the same prospective purchaser, indicates that neither company perceived the range of competitive possibilities in terms as narrow as those advanced by petitioners.

■ Petitioners argue that even if TRW and A–M can be considered competitors, the amount of actual competition between them was *de minimis*, either in absolute dollar amounts or as a percentage of total sales revenue for each company, and thus outside the proscription of section 8.[8] The statute contains nothing that suggests a require-

ment of some substantial quantum of competition. Because there exist *per se* violations of the antitrust laws, *see, e. g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221–23, 60 S.Ct. 811, 843–44, 84 L.Ed. 1129 (1940), Congress, by prohibiting interlocks between companies as to which "elimination of competition between them would constitute a violation of *any* of the provisions of *any* of the antitrust laws" (emphasis added), plainly meant to reach interlocks between competitors without regard to the amount of commerce that might be restrained. *See United States v. Crocker National Corp., supra*, 422 F.Supp. at 703; *United States v. Sears, Roebuck & Co., supra*, 111 F.Supp. at 619–21. Section 8 was designed to prevent restraints on competition before they materialized by outlawing a particular practice thought to facilitate such restraints. Congress undoubtedly was as concerned with restraints that stop the growth of competition at a low level as it was with restraints affecting substantial segments of commerce.

Therefore, on the facts of this case we hold that there was substantial evidence to support the Commission's finding that TRW and A–M were "competitors" for the purposes of section 8. We also hold that a *de minimis* exception is not contemplated by that section.

### III.

### THE PETITIONERS' DEFENSES

Shepard and TRW, either individually or jointly, raise four additional objections to the Commission's finding of a violation of section 8. We find none of them persuasive. We shall address each separately.

#### A. *Applicability of Section 8 to Corporations*

■ Section 8 states, in pertinent part, that "[n]o person at the same time shall be a director in any two or more corporations ...." TRW argues from this language

---

**8.** The Commission did not decide whether the statute permits a *de minimis* defense. Instead, it concluded that the companies' competitive sales were not *de minimis* in amount. 93 F.T.C. at 385–86.

that section 8 only proscribes conduct by the individual director and not by the corporations on whose boards the director serves.[9] The Commission maintains that section 8 must be read *in pari materia* with section 11 of the Act, 15 U.S.C. § 21(b), which requires the Commission, upon finding a violation, to issue "an order requiring *such person* to cease and desist from such violations, and . . . rid *itself* of the director chosen contrary to the provisions of" section 8. (Emphasis added.) TRW explains this language by pointing out that section 8, as originally enacted, explicitly prohibited banking corporations from having interlocking directors. *See* 38 Stat. 733 (1914). This language was subsequently eliminated, Banking Act of 1935, Pub. L. No. 305, § 329, 49 Stat. 717–18, and the language of section 11 is merely a remainder of that original provision covering banking corporations.

We find persuasive the reasoning of the only other court of appeals to decide this question. In *SCM Corp. v. FTC*, 565 F.2d 807, 810–11 (2d Cir. 1977), *cert. denied,* ⸺ U.S. ⸺, 101 S.Ct. 80, 66 L.Ed.2d 23 (1980), the Second Circuit rejected arguments identical to those presented by TRW and held that section 8 properly applies to corporations. *Accord, Jicarilla Apache Tribe v. Supron Energy Corp.*, 479 F.Supp. 536, 544 (D.N.M.1979); *United States v. Sears, Roebuck & Co.*, 165 F.Supp. 356 (S.D. N.Y.1958). The Second Circuit's reading of the legislative history convinced it that the language of section 11 was not merely "a meaningless vestige of an earlier version of the statute." 565 F.2d at 811. We agree. Read in conjunction with section 11, section 8 prohibits corporations from choosing, and natural persons from serving as, directors in violation of section 8's substantive requirements.[10]

### B. *The Statutory Grace Period*

 Petitioners fare no better with respect to their second objection. The last paragraph of section 8 provides that if a person is eligible to become a director at the time he is elected,

> his eligibility to act in such capacity shall not be affected and he shall not become or be deemed amenable to any of the provisions hereof by reason of any change in the affairs of . . . [the] corporation . . . until the expiration of one year from the date of his election or employment.

The Commission interpreted this provision to establish a "grace" period consisting of one year following the date of the director's *lawful* election next preceding the date liability first attaches. 93 F.T.C. at 383–85. The Commission at oral argument before this court reasoned that TRW and A–M became competitors in May 1973 when A–M announced the marketing of its AMCAT product. *See* Paragraph 2.a., Appendix. Shepard was thereafter ineligible to serve simultaneously on both boards. Liability first attached on that date. Therefore, the next preceding election of Shepard to either board was the November 1972 A–M election. The grace period thus extended from that date until November 1973. Since the violation continued beyond November 1973, the allowance of a grace period does not aid the petitioners.

The petitioners appear not to challenge the Commission's interpretation of the grace period. Rather they contend that the Commission did not establish that Shepard was ineligible to serve as an A–M director on November 7, 1974, the date of his last election to the A–M board and one year prior to his departure from that board. As a result, the petitioners insist no violation occurred beyond the grace period. We ac-

---

**9.** In *United States v. W. T. Grant Co.*, 345 U.S. 629, 634 n. 9, 73 S.Ct. 894, 898, n.9, 97 L.Ed. 1303 .(1953), the Supreme Court expressly reserved judgment on the question "whether corporations may violate Section 8 or, for other reasons, be enjoined under the statute."

**10.** TRW maintains that if § 11 is given "substantive," as opposed to "procedural," weight

it permits only an order requiring the corporation to "rid itself" of the offending director. It does not authorize an injunction of future violations. This argument ignores the language of section 11 *also* authorizing "an order requiring such person to cease and desist from such violations." 15 U.S.C. § 21(b) (1976).

knowledge that under our view of the record most instances of competition for the patronage of particular purchasers occurred between November 7, 1974, and November 7, 1975. However, we conclude that the Commission's finding that Shepard was ineligible to serve prior to November 7, 1974, is supported by substantial evidence. Prior to that date, both companies offered for sale the products described in the Appendix and, in at least one instance, competed for the business of the same prospective purchaser.[11] Therefore, the next preceding election to the A–M board was on November 6, 1973, with the result that the grace period expired before Shepard's departure from the A–M board.

## C. *Denial of an Opportunity for Pre-complaint Presentations*

The petitioners next argue that the Commission and its staff abused the administrative process, denied petitioners equal protection and due process of law, and violated federal law by denying petitioners an opportunity to oppose issuance of a complaint by the Commission before it was actually served on them. Although the petitioners have not directly addressed the issue of relief, we assume they seek to have the Commission's order vacated.

The relevant facts are as follows. On August 8, 1975, petitioners were first informed, by letter, of the FTC staff's investigation. In December 1975 counsel for petitioners met with FTC staff personnel in Washington and were told that petitioners would be informed as soon as the staff had decided to recommend that the Commission issue a complaint. This did not happen. The Commission voted to issue a complaint on June 17, 1976, and the petitioners were not informed until June 25. In a memorandum dated July 7 the FTC's general counsel

advised the Commission to take the position that a complaint "issues," for purposes of various Commission rules, when the vote to direct issuance occurs. The principal effect of this interpretation would be to bar *ex parte* contacts with Commissioners following a vote to issue a complaint. Two days later, July 9, the petitioners filed a motion for reconsideration with the Commission. Apparently following the general counsel's advice, the Commission refused to consider the motion and instead referred it to an ALJ on July 13. On July 22, the petitioners were actually served with the complaint and the ALJ in charge of the case was identified for the first time. In September the ALJ certified petitioners' motion for reconsideration to the Commission, who denied the motion on October 13.

On these facts petitioners base two objections. First, they contend the Commission is equitably estopped from failing to give effect to the staff's promise that petitioners would be notified when the proposed complaint was forwarded to the Commission. Second, they maintain that the Commission violated the Constitution and federal law by "changing the rules" in order to deny petitioners an opportunity to present argument to the Commissioners before the complaint was actually served. We shall address each objection separately. We conclude neither is persuasive.

### 1. *Equitable Estoppel*

 Turning first to petitioners' estoppel contention, we find that our decisions establish four requirements that must be satisfied before equitable estoppel may be applied against the government. First, the party to be estopped must know the facts. Second, this party must intend that his conduct shall be acted on, or must so act that the party asserting estoppel has a right to

---

11. A representative of Glendale Federal Savings & Loan Association contacted TRW and three other companies in late June or early July 1974 about purchasing equipment for Glendale's proposed EFT program. A–M approached Glendale Federal in late July or early August and provided a demonstration of the AMCAT terminal in late August. The AMCAT

was found wanting, but A–M persisted in attempting to sell to Glendale Federal. TRW eventually began developmental work on a terminal specially designed for Glendale Federal's needs, the TT–115, in the fall of 1974, although a formal purchase contract was not signed until March 1975. *See* 93 F.T.C. at 340–41.

believe it is so intended. Third, the party asserting estoppel must have been ignorant of the facts. Finally, the party asserting estoppel must reasonably rely on the other's conduct to his substantial injury. *United States v. Ruby Co.*, 588 F.2d 697, 703 (9th Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *United States v. Wharton*, 514 F.2d 406, 412 (9th Cir. 1975); *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 96 (9th Cir. 1970). In addition, the government action upon which estoppel is to be based must amount to affirmative misconduct. *Vickars-Henry Corp. v. Board of Governors*, 629 F.2d 629, 635 (9th Cir. 1980); *United States v. Ruby Co., supra*, 588 F.2d at 703; *Santiago v. INS*, 526 F.2d 488, 491 (9th Cir. 1975) (en banc), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). Affirmative misconduct, moreover, is something more than mere negligence. *Simon v. Califano*, 593 F.2d 121, 123 (9th Cir. 1979); *Santiago v. INS, supra*, 526 F.2d at 493.[12]

■ We will assume that the staff's assurance to petitioners that they would be notified prior to its forwarding of a proposed complaint to the Commission was unwise and unauthorized. Nevertheless, this case is an inappropriate one in which to apply estoppel against the government. There is no indication that petitioners relied on this assurance in a way that caused them to suffer substantial prejudice. As we explain later, petitioners had no right to a precomplaint presentation, and there is no guarantee one would have been available even if the staff had kept its word. We do not condone the staff's conduct in this case, but we are unable to find that each of the prerequisites of estoppel have been satisfied.

### 2. Constitutional and Statutory Arguments

■ On becoming aware that the Commission had voted to direct issuance of a complaint, petitioners attempted to contact the Chairman of the Commission to discuss redress for the staff's violation of its promise. Petitioners also filed a motion for reconsideration of the vote. Both attempts were rejected. The Commission relied on its Rule of Practice forbidding *ex parte* contacts with Commissioners following "issuance" of a complaint.[13] "Issuance" was interpreted, as we have seen, as occurring when the vote to direct issuance was taken. Petitioners were so informed by letter of July 15, 1976, and a Rule of Practice confirming it was formally promulgated on March 23, 1978. 43 Fed.Reg. 11978 (codified in 16 C.F.R. § 3.11(a) (1980)). Petitioners contend that "issuance" did not occur until actual service of the complaint, although they concede that no Rule of Practice defined the term.[14] Petitioners also subject the Commission's new interpretation to several challenges.

First, they maintain that they were "adversely affected" by the new interpretation which was applied to them without prior publication as required by the Freedom of Information Act, 5 U.S.C. § 552(a)(1). By the terms of section 552(a)(1), "a person

---

**12.** *See Villena v. INS*, 622 F.2d 1352, 1360–61 (9th Cir. 1980) (en banc); *United States v. Ruby Co., supra*, 588 F.2d at 704.

**13.** Rule 4.7, as it read at the time, prohibited *ex parte* communications between Commissioners and persons not employed by the Commission or employees performing any investigative or prosecuting function. The rule was stated to apply "in an adjudicative proceeding." 32 Fed. Reg. 8449, 8458 (1967). Rule 3.11(a) provided that "an adjudicative proceeding is commenced by the issuance of a complaint by the Commission." 40 Fed.Reg. 60043 (1975).

**14.** Rule 3.11(a), as originally promulgated, provided that "an adjudicative proceeding is commenced by the issuance and service of a com- plaint by the Commission." 32 Fed.Reg. 8449 (1967). The rule was amended on December 3, 1975, to provide that "an adjudicative proceeding is commenced by the issuance of a complaint by the Commission." The history of the rule does not favor the position advanced by petitioners. In any event, the Rules as amended did not further define "issuance." In its present form, Rule 3.11(a) establishes that "an adjudicative proceeding is commenced when an affirmative vote is taken by the Commission to issue a complaint." 16 C.F.R. § 3.11(a) (1980). The rule prohibiting *ex parte* contacts has also been amended explicitly to recognize this change. *See id.* § 4.7(e).

may not in any manner ... be adversely affected" by matter required to be published under the Act but which was not published prior to the offending action. Accordingly, the petitioners assert that the Commission's new interpretation, not having been published finally until 1978, could not lawfully be applied to them in July 1976.

We need not decide whether the Commission's interpretation was a matter required to be published by the Act.[15] We conclude that petitioners were not "adversely affected" within the meaning of section 552(a)(1). Even before the Commission adopted its interpretation of "issuance," neither the Commission's Rules of Practice nor its informal practice provided for precomplaint presentations to the Commissioners. Under these circumstances, petitioners had no right to present argument after the vote but before service of the complaint. The Commission had the power in its discretion to reject any contact with petitioners prior to service of the complaint. This power was not dependent on the issuance of the new interpretation. Therefore, the new interpretation did not adversely affect the petitioners and section 552(a)(1) accordingly was not violated.

■ For similar reasons we reject petitioners' protest that the new interpretation amounts to a denial of due process and equal protection of the law. The Commission's prior practice was not a "rule" to which the Commission is constitutionally compelled to adhere. Even if the Commis-

sion's prior treatment of such requests had amounted to an agency "practice," its failure to follow that practice would have afforded petitioners no defense to the underlying complaint. *United States v. Wilbur,* 427 F.2d 947, 949 (9th Cir.), *cert. denied,* 400 U.S. 945, 91 S.Ct. 250, 27 L.Ed.2d 250 (1970). Whether to grant an opportunity for informal disposition of a complaint is, to repeat, within the Commission's discretion. *FTC v. Jantzen, Inc.,* 383 F.2d 981, 983 (9th Cir. 1967).

■ Finally, even if the Commission had violated one of its own rules in denying petitioners an opportunity for precomplaint presentations, the result would be the same. No precise standard exists which describes the circumstances in which an agency's violation of its own rules will bar enforcement of its otherwise proper orders. *See* 2 K. Davis, Administrative Law Treatise § 7:21 (2d ed. 1979). There is no need to attempt to devise one in this case, however, because we are convinced that the petitioners have not been prejudiced. *See Carnation Co. v. Secretary of Labor,* 641 F.2d 801, 804 & n. 4 (9th Cir. 1981); *United States v. Calderon-Medina,* 591 F.2d 529, 531–32 (9th Cir. 1979). This is certainly not an instance in which "an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency." *United States v. Caceres,* 440 U.S. 741, 743, 99 S.Ct. 1465, 1467, 59 L.Ed.2d 733 (1979).[16] The petitioners received a full

---

**15.** The publication requirements of Rule 552(a)(1) apply to (1) organization descriptions and sources of public information; (2) "statements of the general course and method by which [the agency's] functions are channeled and determined"; (3) rules of procedure and forms; (4) "substantive rules of general applicability ... and statements of general policy or interpretations of general applicability"; and (5) amendments, revisions, or repeals of the foregoing. 5 U.S.C. § 552(a)(1)(A)–(E) (1976).

**16.** In *Caceres* the Supreme Court held that evidence obtained in violation of Internal Revenue Service regulations may be admitted to the criminal trial of a taxpayer accused of bribing an IRS agent. The regulation at issue required Justice Department approval prior to use of

wiretaps by IRS agents. The Court found no equal protection problem because the taxpayer had failed to demonstrate that the Justice Department would have denied permission to wiretap. 440 U.S. at 752, 99 S.Ct. at 1472. Nor was the case one "in which the Due Process Clause is implicated because an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency." *Id.* at 753, 99 S.Ct. at 1472. Having disposed of the constitutional arguments, the Court noted, in dictum: "Even as a matter of administrative law ... it seems clear that agencies are not required, at the risk of invalidation of their action, to follow all their rules, even those properly classified as 'internal.'" *Id.* at 754 n. 18, 99 S.Ct. at 1473 n. 18.

and procedurally correct adjudicative hearing. At most, any error of which petitioners complain "is purely one of form, with no discernible effect in this case on the action taken by the agency and its treatment" of petitioners. *Id.* at 752, 99 S.Ct. at 1472.

### D. *Mootness*

 Petitioners also argue that this case is moot. Four reasons are given. First, Shepard left his post as an A-M director before the complaint was issued and, in fact, had decided not to stand for reelection before receiving notice of the FTC investigation. Second, A-M sold its AMCAT line in January 1977 and is no longer a competitor of TRW in any sense of the word. Third, TRW and Shepard have both provided sworn assurances that they will avoid offensive directorships in the future. Finally, TRW now maintains sophisticated director review procedures to ensure compliance with section 8. We hold that this case is not moot.

In its only decision discussing section 8, the Supreme Court rejected the argument that mere cessation of illegal conduct renders a case moot:

> [V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.*, does not make the case moot.... A controversy may remain to be settled in such circumstances, ... *e. g.*, a dispute over the legality of the challenged practices.... The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled militates against a mootness conclusion.... For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right .... The courts have rightly refused to grant defendants such

a powerful weapon against public law enforcement.

*United States v. W. T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

Nevertheless, the Court held, a case may be moot "if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' The burden is a heavy one." *Id.* at 633, 73 S.Ct. at 897; (quoting *United States v. Aluminum Co. of America,* 148 F.2d 416, 448 (2d Cir. 1945)).[17] Stated somewhat differently, it must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). These cases indicate that the concern is with repeated violations of the same law, and not merely with repetition of the same offensive conduct—here, another interlock between TRW and A-M involving Shepard. In addition, it is clear that promises to refrain from future violations, no matter how well meant, are not sufficient to establish mootness. *Quern v. Mandley,* 436 U.S. 725, 733–34 n. 7, 98 S.Ct. 2068, 2074, n. 7, 56 L.Ed.2d 658 (1978); *Concentrated Phosphate, supra,* 393 U.S. at 203, 89 S.Ct. at 364; *W. T. Grant, supra,* 345 U.S. at 633, 73 S.Ct. at 898; *see Treves v. Servel, Inc.,* 244 F.Supp. 773, 776 (S.D.N.Y.1965).

Shepard continues to serve on the board of TRW, a company with interests in a wide variety of commercial fields. In the past Shepard has been a popular target of corporations seeking outside directors. Although we do not question the good faith of petitioners' assurances of future compliance with the law, we hold that the heavy burden of proof regarding mootness has not been satisfied.

---

**17.** *Accord, County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 537–38, 98 S.Ct. 2923, 2927, 57 L.Ed.2d 932 (1978); *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); *DeJong Packing Co. v. United States*

*Dep't of Agriculture,* 618 F.2d 1329, 1337–38 (9th Cir. 1980); *Lyons v. City of Los Angeles,* 615 F.2d 1243, 1248 (9th Cir.); *cert. denied,* ── U.S. ──, 101 S.Ct. 333, 66 L.Ed.2d 158 (1980); *SCM Corp. v. FTC,* 565 F.2d 807, 812 (2d Cir. 1977), *cert. denied,* ── U.S. ──, 101 S.Ct. 80, 66 L.Ed.2d 23 (1980).

## IV.

### THE VALIDITY OF THE COMMISSION'S ORDER

■ Although we have found substantial evidence to support the Commission's finding that petitioners violated section 8, and although we have determined that the case is not moot, we conclude that the Commission erred in issuing cease and desist orders against Shepard and TRW. The legal standard governing our review of the need for prospective relief is whether "there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *W. T. Grant, supra*, 345 U.S. at 633, 73 S.Ct., at 898. The difference between the standard governing mootness and that regarding the need for prospective relief thus is one between a "mere possibility" and a "cognizable danger" of recurrent violation. More significantly, the Commission complaint counsel bears the burden of showing the need for injunctive relief while the burden of proving mootness rests on the respondent. *E. g., SCM Corp. v. FTC*, 565 F.2d 807, 812, 813 (2d Cir. 1977), *cert. denied*, —— U.S. ——, 101 S.Ct. 80, 66 L.Ed.2d 23 (1980).

■ The Commission's finding of a cognizable danger of recurrent violation by Shepard depended on (1) the frequency of Shepard's service on corporate boards in the past and (2) the variety of TRW's commercial interests. 93 F.T.C. at 386–87. These factors, at best, demonstrate that it is more feasible for Shepard to violate the law than for another less popular director serving on the board of a less diversified company.[18] There is little else in the record to justify a cease and desist order and it is not enough. As the Commission itself recognized, Shepard sought legal counsel before accepting the A-M directorship, the violation was not egregious,[19] and the evidence suggests that Shepard discontinued the A-M directorship before being apprised of the FTC investigation. Thus, while we cannot say that it is "absolutely clear" that repetition will not occur, we can and must say there is simply nothing to suggest a "cognizable danger" of repetition by Shepard.

The situation is little different with respect to TRW. The Commission's finding of a "cognizable danger" apparently was based solely on TRW's failure to recognize a section 8 violation and prevent Shepard's service on the A–M board. *Id.* at 388. By this reasoning, however, the mere existence of a section 8 violation would justify prospective relief, regardless of the circumstances. To reach this conclusion would amount to ignoring the "cognizable danger" requirement in the hope of forging a more effective regulatory statute. That is the task of Congress. Petitioners' violation of the law was not a blatant one, nor have they demonstrated a tendency to run afoul of section 8. The decision to terminate the offensive conduct was made before issuance of the complaint and arguably before notice of the FTC's investigation. Both parties have provided assurances of future compliance and their sincerity and good faith are not questioned. TRW has implemented a compliance program whose current efficacy has not been attacked. On this record the Commission abused its discretion in issuing cease and desist orders and those orders, as to both petitioners, are hereby set aside.

Affirmed in part and Reversed in part.

### APPENDIX

#### 1. *TRW*

TRW is a diversified, publicly held company engaged in the design and manufac-

---

18. As the Commission recognized, however, Shepard's popularity as a prospective outside director will be reduced by his advancing age (65 at the time appeal was taken to the Commission) and the prevalence of mandatory retirement policies applicable to corporate board members. *See* 93 F.T.C. at 387.

19. By contrast, for example, the respondent in *W.T. Grant* served on the boards of three separate pairs of corporations; he failed to terminate the directorships until after suit was filed, despite five years of administrative attempts to persuade him of their illegality; and he failed to make any assurance that he would not commit similar violations in the future. 345 U.S. at 633–34, 73 S.Ct. at 898–99.

ture of a wide variety of products as well as the performance of advanced electronics and computer-based services. Three of its products or services are relevant.

a. *System 4000/5000.* This product was a credit authorization system designed for use by and sold mainly to department stores (4000) and financial and thrift institutions (5000). The two systems were identical, although marketed separately. They consisted of a small computer terminal with a keyboard and display, and a "controller" through which the terminals communicated with a central computer. When used in a department store, for example, the system consisted of a number of small terminals located at points of sale throughout the store. The terminals were connected to the controller, also located in the store. The controller communicated with a central computer, not located in the store, which stored customer credit information developed by the user. As designed, the System 4000/5000 was used only to request and receive credit information at the point of sale. It had no ability to print or imprint information,[1] although additional equipment could be added to perform these functions.[2]

b. *Validata System.* Validata was a service sold primarily to airlines and car rental agencies. Through Validata, TRW provided a list of credit accounts not to be honored, based on information compiled by TRW from major credit card companies and financial institutions. Purchasers of this "loss protection" service were not required to purchase TRW equipment, although such equipment was available.[3]

c. *FDSI Terminals.* TRW acquired Financial Data Services, Inc., (FDSI) on April 23, 1974. Through FDSI, EFT systems were developed and marketed. Although the Commission's opinion refers to three

EFT concepts developed by FDSI, only one, the TT-115, was actually sold by TRW during the complaint period. The TT-115 was designed at the request of and sold to Glendale Federal Savings & Loan for use in a supermarket chain. Similar in design to the System 4000, the TT-115 consisted of terminals located at supermarket check stands through which customers could make deposits to and withdrawals from savings and checking accounts.

2. *A-M*

A-M is also a publicly held company. During the complaint period its primary business was the manufacture and sale of office equipment and duplicating machines.

a. *AMCAT I.* The AMCAT I was announced by A-M as a new product in May 1973 and was first sold in October 1973. It performed a function similar to that of TRW's System 4000/5000, enabling retailers to request and receive credit authorization information at the point of sale. In design, however, the systems differed significantly. Unlike the System 4000/5000, the AMCAT I terminal contained equipment enabling it to communicate directly with a central computer without the aid of an external controller. As a result, the AMCAT I terminal was larger than the terminal used in the System 4000/5000 and was purchased largely by small retail establishments. It was designed for use in gasoline service stations, although few were ever sold for that use. The AMCAT I also was able to perform printing and imprinting functions and could "read" credit cards, relaying the information directly to the computer.

b. *Other A-M Products.* The AMCAT IC was used in the First National Bank of Atlanta's EFT program and featured a consumer-operated means of verifying checks at points of sale. Otherwise, AMCAT IC

---

1. A printer is a device "applying text or numbers to a page in response to an electronic impulse" and an imprinter "transfer[s] raised characters to an inked piece of paper." *In re TRW, Inc., supra,* 93 F.T.C. at 335.

2. The ALJ found that the terminal "could be upgraded to include an imprinter, card reader

and customer identification pads. However, these items would be included alongside and not in the terminal housing." *Id.* at 336.

3. System 4000/5000 equipment was available in connection with the Validata service.

resembled the AMCAT I and was used primarily in small retail establishments. Although A-M developed other AMCAT variants, few were ever sold during the complaint period. In January 1977, A-M decided to abandon the AMCAT business and sell the assets which had been used to produce the AMCAT line.