**Alexander A. AZAR, Plaintiff,**

v.

**U.S. POSTAL SERVICE, Defendant.**

**Civ. No. F 83–315.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

July 20, 1984.

T. Russell Strunk, Jr., Rothberg, Gallmeyer, Fruechtenicht & Logan, Fort Wayne, Ind., for plaintiff.

Evan M. Spangler, Asst. U.S. Atty., Fort Wayne, Ind., for defendant.

## MEMORANDUM OPINION AND JUDGMENT

LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial, held July 13, 1984. Plaintiff brought this damage action pursuant to 39 U.S.C. § 409, alleging that the defendant is liable upon a contract of insurance between it and plaintiff for the full value of a lost package, sent via Express Mail Next Day Service, worth $7,500.00. The court, having examined the entire record, including post-trial submissions, and having determined the credibility of the witnesses, after viewing their demeanor and considering their interests, hereby enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

Jurisdiction and venue are properly present in this court and are conceded by the parties. Alexander A. Azar (Azar) is the plaintiff in this action. Plaintiff is a sophisticated and experienced businessman whose primary business interests are in the area of restaurant and hotel management. The defendant is the United States Postal Service (Postal Service), an independent agency of the Executive Branch of the United States Government. The Postal Service has an absolute monopoly on the processing and delivering of first class

mail. Since approximately 1979, the United States Postal Service has engaged in direct competition with private mail services such as Federal Express and Purolator, which promise overnight delivery, through its Express Mail Next Day Service (Express Mail). Express Mail has been an excellent money maker, earning substantial profits for the United States Postal Service and has been a "good promotional service." Express Mail is a profitable proprietary operation of the United States Postal Service.

The following facts were stipulated by the parties. Azar mailed a package via Express Mail on or about May 17, 1983. The package which Azar sent via Express Mail contained a watch worth $7,500.00. The package was addressed to the Fort Worth Gold and Silver Exchange; the package was never received by the Fort Worth Gold and Silver Exchange. Azar paid $7,500.00 to the Fort Worth Gold and Silver Exchange as a result of the failure of delivery of the Express Mail package which contained the watch. Azar demanded $7,500.00 from the Postal Service as reimbursement for the lost watch. The Postal Service refused to pay more than $500.00 on Azar's claim.

The following findings of fact are based upon the evidence produced at trial. Azar had never used an air express service, and in particular, Azar had never used Express Mail to send packages. Azar approached the window at the Main Post Office in Fort Wayne, Indiana and spoke with a clerk, later identified as Fred Dyar. Azar informed the clerk that he wished to send the package he had in his hand via "Air Express." The postal clerk handed Azar a form to fill out. Plaintiff's Exhibit No. 1. The form which Azar filled out contained small print which explained the service guarantee of Express Mail Service and the insurance coverage of Express Mail Service. Azar is far sighted and is unable to read fine print without his glasses. Azar did not have his glasses on at the time he filled out the Express Mail form on May 17, 1983. The form reflects Azar's name and address and the name and address of the Fort Worth Gold and Silver Exchange in Fort Worth, Texas.

Azar informed the postal clerk that he wanted to insure the package; Azar had his billfold in his hand ready to pay for insurance coverage. The postal clerk informed Azar either that Azar did not need insurance or that he was covered under the terms of the Express Mail Service. Azar pressed the postal clerk on the issue, questioning the clerk if he was sure Azar did not need to purchase insurance. The postal clerk turned to a second postal clerk and asked the other clerk whether Azar needed insurance. The second clerk asked Azar if the package was worth over $50,000.00. Azar replied no. The first postal clerk, who was serving Azar, stated that Azar therefore had no need of insurance. The clerks involved appeared to be and were mature and experienced. Azar would have questioned the clerks involved more closely if the clerks had appeared younger or less experienced. The postal clerks intended Azar to act upon their statements. Azar did not feel that he could press the matter further with the clerks.

Azar reasonably accepted and relied upon the representations of the postal clerks at the windows on May 17, 1983. Azar would, under no circumstances, have sent the package uninsured. The postal clerk finished filling out the Express Mail form, gave Azar his receipt, and Azar left the Post Office. Azar never informed the window clerks what was contained in the package or its worth. He did not inform the postal clerk of these facts because he believed the information irrelevant due to the representations to him that the package would be adequately insured if the items therein carried a value of less than $50,-000.00.

The Express Mail form which Azar filled out contained a clear discussion of the insurance coverage for items sent via Express Mail. Parcels shipped by Express Mail which contain merchandise are insured only up to a maximum of $500.00. Azar's package contained merchandise.

Nonnegotiable documents are insured up to $50,000.00 per piece. Although the form Azar filled out contained a discussion of insurance coverage under Express Mail delivery, Azar, without the benefit of his glasses, could not read small print. The insurance coverage details are in small print. Azar had no knowledge of the terms of the insurance contract other than that information given to him by the clerks at the windows.

The postal clerk involved had viewed a ten minute film on Express Mail several years earlier, but could not remember being trained about or informed of insurance coverage for Express Mail service. Postal clerks are expected to know their jobs and the information necessary to carrying out their duties.

Several days later, the Fort Worth Gold and Silver Exchange contacted Azar and informed him that the package had not arrived and that the Exchange had another buyer for the watch and needed the watch. Azar contacted Eugene Gabriel, Postmaster of the Fort Wayne Post Office, and informed him of the problem. Gabriel was very helpful to Azar, assisting Azar in filling out a tracer for the lost package and instituting security checks. The tracer filled out on May 25, 1983, contains the following remark by Mr. Azar: "Tried to insure article but was told by clerk and verified by clerk next to him that *air express* articles insured up to $50,000." Plaintiff's Exhibit No. 2 (emphasis in exhibit). Azar filed a claim on the insurance policy arising in connection with the Express Mail package seeking reimbursement for the $7,500.00 which he paid to the Fort Worth Gold and Silver Exchange. Under what it believed was the correct interpretation of the contact of insurance with Azar, the Postal Service tendered payment of $500.00. Azar retained the check, but did not cash it.

### Conclusions of Law

There is no question that the insurance coverage stated on the form used in Express Mail limits recovery for lost merchandise to $500.00. The legal issue presented in this case is, in light of the clear written terms of the Express Mail insurance coverage contract, whether the United States Postal Service may be equitably estopped by the representations of its agents or employees. The resolution of this issue is controlled by *Portmann v. United States*, 674 F.2d 1155 (7th Cir.1982), and its progeny. *Portmann* holds that the doctrine of equitable estoppel may be asserted against the United States Postal Service in actions arising out of losses of Express Mail packages.

The facts of *Portmann* are virtually identical to the facts of this case. In *Portmann*, the plaintiff, a free-lance graphic arts designer, used the Express Mail service offered by the United States Postal Service to effect delivery of three packages from Highland Park, Illinois to New York City, New York. Portmann alleged that she informed the postal clerk of the great value of the packages' contents and that insured delivery was imperative. Portmann further alleged that the postal clerk informed her that her packages were insured against losses up to $50,000.00. The clerk in the *Portmann* case apparently made the representation of the $50,000.00 figure because the clerk believed the color film separations in the three packages were non-negotiable documents covered by document reconstruction insurance, a subcategory of Express Mail insurance automatically given a customer of Express Mail. Based upon the postal clerk's representations, Portmann paid the Express Mail fee, designated the values of the three packages, and mailed the packages via Express Mail. The most expensive of the three packages was never delivered. The Postal Service, upon examining Portmann's claim for indemnity for the lost package, took the position that the package contained merchandise and therefore, Portmann's recovery was limited to $500.00. The district court, on cross-motions for summary judgment, held that estoppel was unavailable against the United States Postal Service as a matter of law. The Seventh Circuit re-

versed and remanded that conclusion in an extensive and scholarly opinion.

The *Portmann* decision examines and analyzes the history of the use or preclusion of use of the doctrine of equitable estoppel against the federal government. After concluding that various Supreme Court cases which had barred the use of the doctrine of equitable estoppel in particular cases did not create an absolute bar against the use of the doctrine of equitable estoppel against the federal government in certain situations, the *Portmann* court turned to the fashioning of a test.

The *Portmann* court examined the sovereign v. proprietary test and concluded that "[d]espite its practical appeal, an analysis focusing *solely* on a sovereign vs. proprietary distinction has several significant shortcomings." *Id.* at 1161 (emphasis supplied). The court concluded that a variety of factors, in addition to the sovereign/proprietary test, needed to be examined in order to determine the availability of estoppel against the government in any particular case. The court adopted the test outlined in *TRW, Inc. v. Federal Trade Commission*, 647 F.2d 942 (9th Cir.1981):

First, the party to be estopped must know the facts. Second, this party must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has a right to believe it is so intended. Third, the party asserting estoppel must have been ignorant of the facts. Finally, the party asserting estoppel must reasonably rely on the other's conduct to his substantial injury. In addition, the Ninth Circuit noted that "the government's action upon which estoppel is to be based, must amount to affirmative misconduct," which that court defined as "something more than mere negligence."

*Portmann*, 674 F.2d at 1167 *quoting TRW*, 647 F.2d at 950–51. The *Portmann* court identified the preceding factors as the central equitable considerations to be considered. The court then went to say:

We further believe that other factors identified in this court's prior estoppel decisions, *including the type of government activity being pursued,* the reasonableness of plaintiff's reliance, and the potential danger, posed by estoppel, of undermining important federal interests or risking a severe depletion of the public fisc, *may appropriately be weighed in the equitable balance.*

*Id.* (emphasis supplied).

In examining the particular governmental entity before it, the *Portmann* court concluded that its decision "that equitable estoppel may be available against the government in the instant case is also supported by the somewhat unique, quasi-private status of the United States Postal Service." *Id.* at 1167–68. In particular, on the basis of the facts in the *Portmann* case which involved the use by a customer of the Express Mail service offered by the United States Postal Service, the court focused on the factor of the type of government activity being pursued and stated, "[T]he Service was not performing an inherently sovereign or peculiarly governmental function. Instead, it was competing directly for plaintiff's business with a number of private express mail carriers. Under these circumstances, we see no reason why the Postal Service should not be held to the same commercial standards in dealing with its customers as would an analogous private entity. ... [N]o threat to the public fisc is directly involved." *Id.* at 1168–69. The *Portmann* court remanded the case to the district court for a determination whether the application of equitable estoppel was appropriate based on the facts of the specific case. *Id.* at 1169.

Applying the facts of this case to the *Portmann* test, the court concludes that plaintiff has met his burden to show by a preponderance of the evidence that he has met the four factors of the traditional equitable estoppel test. The first factor of equitable estoppel requires that the party to be estopped must know the facts. Here the party to be estopped is the Postal Service. The defendant, the United States Postal Service, knows what the terms and conditions of insurance coverage for Ex-

press Mail service are. All employees of the Postal Service should be familiar with the duties of their particular job. One of the duties of any window clerk at a United States Post Office would be to know the insurance coverage given to a person wishing to use the Express Mail service of the United States Postal Service. Even if the postal clerk involved could be said to have no knowledge of the actual insurance terms for Express Mail, the postal clerk involved certainly can be charged with the knowledge of where that information could be found. The proper information regarding insurance coverage is shown on the front of an Express Mail Service order form. The Postal Service knew that Azar required insurance coverage on the package at least in an amount of $50,000.00, that being the figure which satisfied his inquiries. The United States Postal Service knew the correct facts regarding insurance coverage under the Express Mail Service and Azar's need for same within the $50,-000.00 limit represented to him.

The second requirement of equitable estoppel is that the party to be estopped must intend that his conduct shall be acted upon or must act so that the party asserting estoppel has a right to believe it is so intended. Here Azar questioned the postal clerk about insurance, not once, but twice. Azar was prepared to purchase the insurance coverage he needed. The postal clerk clearly intended that his actions with regard to Azar should be acted upon by Azar and in fact, the conduct of the postal clerk did cause Azar to act. The postal clerk specifically informed Azar that the insurance coverage for his package extended to the amount of $50,000.00. Azar informed the postal clerk he needed insurance and the postal clerk replied that the package involved was insured. Plaintiff has met his burden to show that the United States Postal Service intended that its conduct should be acted upon by Azar.

The third requirement of the traditional test of equitable estoppel is that the party asserting estoppel, here Azar, must have been ignorant of the facts. Azar was indeed ignorant of the actual fact that insurance coverage for Express Mail packages which contain merchandise is limited to $500.00 if the package is lost. Azar's testimony was totally credible and logical. Azar testified that he did inquire about insurance, that he was prepared to purchase insurance, that, in fact, he had his billfold out to so purchase insurance, and that after asking twice for insurance coverage, he did not purchase insurance because of what was represented to him by the postal clerks. Azar believed the representations of the postal clerks that his package was insured up to $50,000.00 if it was lost without him having to purchase any insurance. Azar held this belief even though the actual insurance coverage terms were printed, in small print, on the face of the form he had filled out in order to send the package. Azar is far sighted and is unable to see close without glasses; Azar did not put his glasses on nor did he read the small print on the Express Mail label he filled out at the postal window on May 17, 1983. Azar was ignorant of the actual fact regarding insurance coverage of Express Mail packages.[1]

The final requirement of the traditional equitable estoppel test is that the party asserting estoppel must reasonably rely on the other party's conduct to his substantial injury. There can be little doubt but that Azar has proven by a preponderance of the evidence this fourth factor. It is not disputed that Azar was forced to reimburse the Fort Worth Gold and Silver Exchange in Fort Worth, Texas, for the value of the watch which was never delivered. That loss was $7,500.00. It was not unreason-

**1.** The credibility of Azar's testimony on this issue cannot be in question. A man of Azar's sophistication and experience, having admittedly inquired about insurance, would not be satisfied with a response that did not satisfy him that such coverage was provided. Further, he clearly would not have misunderstood the terms of the coverage as printed on the form, had it been read to him. The information which he provided on the Tracer document, also corroborates his testimony.

able for Azar to rely upon the representations of two mature experienced clerks who had the demeanor and appearance of knowledge of their jobs. Azar did not accept the representations of the postal clerks without any comment, he did question the postal clerks about the information they had given him about the insurance coverage. Azar, after being reassured a second time by the postal clerks involved, reasonably relied on the representations that had been made to him. Azar suffered substantial injury because of that reasonable reliance. Azar has shown by a preponderance of the evidence that, under a traditional four part equitable estoppel analysis, the defendant, United States Postal Service, is estopped from asserting the defense of the written insurance coverage terms.

However, there is a dispute among the parties as to whether there is a fifth requirement in the *Portmann* test. The defendant argues that the fifth requirement of the *Portmann* test is that, if government action is involved, the governmental conduct complained of must amount to affirmative misconduct. *Portmann*, 674 F.2d at 1167. Plaintiff's argument in reply to the government's contention is that the requirement of showing affirmative misconduct on the part of the government is only applicable in a case applying the equitable estoppel doctrine where the government is acting in its sovereign capacity. Both parties rely on *Portmann* as support for their respective positions. The government also relies on the case of *Pratte v. NLRB*, 683 F.2d 1038, 1041 (7th Cir.1982), wherein the Seventh Circuit stated that, pursuant to *Portmann*, equitable estoppel against the government involves proving a five part test. *Pratte* involved an attorney who was an NLRB appointee whose appointment by the NLRB was revoked. The *Pratte* court, however, focused on the failure of the plaintiff to prove reasonable reliance and did not address the question of affirmative misconduct. It is important to note that the government in the *Pratte* case was clearly acting more in its sover-

eign capacity than in its proprietary capacity.

Although the proprietary/sovereign distinction is not dispositive of the question of whether the doctrine of equitable estoppel applies in a particular case, it is still a relevant distinction and appears to be the crucial distinction in deciding whether, in a particular case, the government or one of its agencies is held either to a four part test or a five part test. *Portmann*, 674 F.2d at 1161, 1167. The latest Seventh Circuit case discussing the question of the *Portmann* test is *Woodstock/Kenosha Health Center v. Schweiker*, 713 F.2d 285 (7th Cir.1983). In that case, the government was acting in its sovereign capacity. The Seventh Circuit stated that it had earlier set forth the factors to be considered in an equitable estoppel case against the government in *Portmann*. The court in *Woodstock/Kenosha* then cited verbatim the traditional four part test as the test *Portmann* mandates. *Id.* at 290.

■ This court is persuaded that the *Portmann* court set forth the traditional four part test as the standard test to be used in determining whether the doctrine of equitable estoppel applies to the government or one of its agencies in a particular case. If the government can show it was acting in its sovereign capacity, then the governmental conduct involved will have to be shown to be affirmative misconduct in order for the doctrine of equitable estoppel to be successfully applied. This court reaches that conclusion after an examination of the Ninth Circuit cases upon which the *Portmann* court relied in discussing the optional fifth requirement of a governmental equitable estoppel test. *TRW*, 647 F.2d at 942. The *TRW* case cites as support for its proposition that "government action upon which estoppel is to be based must amount to affirmative misconduct," *id.* at 951, the case of *Simon v. Califano*, 593 F.2d 121, 123 (9th Cir.1979).

The *Simon* court clearly stated that "the doctrine of equitable estoppel may still not be invoked against the government *in its*

*sovereign capacity* unless that conduct can properly be called 'affirmative misconduct.' Mere neglect of duty is not enough." *Simon*, 593 F.2d at 123 (emphasis supplied). *Cf. Sims v. Heckler*, 725 F.2d 1143, 1146 (7th Cir.1984) (mere oversight is not enough).

In each of the cases where the fifth requirement of affirmative misconduct has been held to be applicable, the government was acting more in its sovereign capacity than in its proprietary capacity. This court concludes that the fifth requirement of affirmative misconduct set forth in *Portmann* applies only in those cases where the government is acting in its sovereign capacity. *Portmann* itself supports that conclusion. *Portmann*, 674 F.2d at 1167–69. *Accord Sims*, 725 F.2d at 1146; *Woodstock/Kenosha*, 713 F.2d at 290; *TRW*, 647 F.2d at 951; *Vickars-Henry Corp. v. Board of Governors*, 629 F.2d 629 (9th Cir.1980); *Simon*, 593 F.2d at 123; *United States v. Ruby Co.*, 588 F.2d 697 (9th Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *Santiago v. INS*, 526 F.2d 488 (9th Cir.1975) (en banc), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *Bell v. O'Leary*, 577 F.Supp. 1361 (E.D.Mo.1983); *United States v. Nez Perce County*, 553 F.Supp. 187 (D.Idaho 1982).

*Portmann* is on all fours with this case. The court is not persuaded by the government's attempt to distinguish *Portmann* on the ground that the packages in question in *Portmann* contained potential documents and the package in question here clearly contained merchandise. The question for decision in *Portmann* was not the issue of what was inside the packages which were lost but was the question of whether, as a matter of law, a person who reasonably relied on the representations regarding insurance of a particular postal clerk or clerks can apply the doctrine of equitable estoppel to attempt to recover the full losses incurred due to the loss of packages.

■ In this instance, as in *Portmann*, the United States Postal Service was not acting in its sovereign capacity; it was acting in its proprietary capacity. In regards to express mail service, the United States Postal Service, through its Express Mail Service, is but one of many competitors for the business of persons who need or wish to send packages via the express mail process. The Postal Service should be held to the same commercial standards in dealing with its customers who use Express Mail as would an analogous private entity such as Federal Express or Purolator. Putting this case "in its own realistic context, quite distinct, for example, from that of the Social Security Administration," *Portmann*, 674 F.2d at 1169, this court concludes that the United States Postal Service was not, in this case, "performing an inherently sovereign or peculiarly governmental function[,] [i]nstead, it was competing directly for plaintiff's business with a number of private express mail carriers," *id.*, and the government, therefore, is not entitled to require the plaintiff to prove the fifth requirement of affirmative misconduct.

■ Assuming, for the sake of discussion, that the government, even acting here in its proprietary function, was entitled to require the plaintiff to show affirmative misconduct by the defendant, the court concludes that the plaintiff has shown by a preponderance of the evidence that affirmative misconduct occurred. If one considers that the evidence underlying affirmative misconduct in a particular case must be that of affirmative misrepresentations, there certainly were affirmative misrepresentations made to Mr. Azar on May 17, 1983.[2] The representations of the postal clerks to Azar upon which he reasonably relied were more than mere neglections of duty or mere oversights. All the postal

---

**2.** The court concludes the term "affirmative misconduct" as used in *Portmann* and *TRW*

does not require intentional misconduct as the government seems to argue.

clerk or clerks involved had to do was to point out and/or read the clear terms of the insurance coverage printed in the Express Mail form to Azar. Yet, with the knowledge that the insurance coverage terms were printed on the front of the Express Mail label, the clerk or clerks made oral representations to Azar that the package was insured up to $50,000.00 and held to that in the face of Azar's questioning. The postal clerk involved did not bother to ask what was in the package or how much it was worth; he simply told Azar that the package was insured up to $50,000.00. It was not incumbent upon Azar nor required of Azar to continue to question the postal clerk after he had asked several times about insurance information. Affirmative misconduct occurred.

The court concludes that the doctrine of equitable estoppel is available against the government. The initial test to be applied is the traditional four part test. Where the government acts in its sovereign capacity, a fifth requirement of affirmative misconduct applies. In this case, the Postal Service acted in its proprietary capacity, directly competing with private entities who could be held liable under similar circumstances. The Postal Service will be held to the same commercial standards as its analogous private competitors. Plaintiff met the four traditional requirements for the application of equitable estoppel. Even if the fifth requirement of affirmative misconduct was required here, the defendant's actions represent affirmative misconduct as defined by law.

### Conclusion

The plaintiff has shown by a preponderance of the evidence that he is entitled to recover upon his complaint for damages in the amount of $7,500.00. The United States Postal Service is equitably estopped to deny Azar's claim for the full amount of the lost item. Accordingly, plaintiff shall be entitled to recover the sum of $7,500.00.